## THE BALTIMORE AND OHIO R. CO. *vs.* STATE, Use of HENRY T. LOGSDON et al.

*Negligence— Trackwalker Struck by Engine Running Back Westerly on East-Bound Track.*

A freight train going east on a dark night on one of the outer of three parallel tracks was broken in two. A few miles further on it was halted and the engineer was directed to go back for the detached cars. The locomotive was switched to the middle track and while proceeding back ran over and killed a young man employed as a trackwalker. In an action to recover damages for the death so occasioned the plaintiff's evidence was that about half an hour before the accident the deceased started to go west on the tracks, carrying a lighted lantern; that the middle track was used for east-bound trains, and that the deceased was struck by the tender of the engine going back west on this track. Defendant's evidence was that there was a light on the end of the tender as it ran back; that the whistle was sounded from time to time and the bell constantly rung, and that the engine driver did not see the deceased before he was struck. This evidence was not contradicted, but one of plaintiff's witnesses testified that after the accident there was no light on the tender. There was no evidence as to why the deceased failed to see or hear the engine or to show that the accident was caused by the absence of a light. It was shown to be proper under the circumstances for the engine to run back westerly on the east-bound track.

*Held*, that the evidence is not legally sufficient to show that there was any negligence on the part of the railway company causing the injury.

Appeal from the Circuit Court for Allegany County (KEEDY and HENDERSON, JJ.), where there was a judgment for the plaintiffs for $3,600.

The cause was argued before McSHERRY, C. J., FOWLER, BRISCOE, PAGE, BOYD and SCHMUCKER, JJ.

*Ferdinand Williams* and *John G. Wilson* (with whom were *Pearre & Lewis* on the brief), for the appellant.

*James A. McHenry* and *Albert A. Doub*, for the appellees.

BOYD, J., delivered the opinion of the Court.

This is an appeal from a judgment against the appellant for the alleged negligence of its agents which resulted in the death of Henry T. Logsdon, Jr., the son of the equitable plaintiffs. The Cumberland and Pennsylvania Railroad Company has three tracks from Mt. Savage Junction to Cumberland, which run through what is called the "Narrows," a gorge in Will's Mountain, near Cumberland. The appellant has an arrangement with that company by which it has the use of those tracks for the purpose of running its trains to and from Cumberland, which pass over the Pittsburg and Connellsville Railroad, now under the control of the appellant—the latter road connecting with the C. & P. R. R. at Mt. Savage Junction. The deceased was a trackwalker employed and paid by the C. & P. R. R. Co. and his duties required him to walk over the tracks between a bridge over Will's Creek, which was east of Mt. Savage Junction and west of the Narrows, and what is known as the viaduct in Cumberland. He was required to inspect the tracks in his territory, examine the rails, remove obstructions, signal the trains if anything was wrong with the tracks or trains, see that switches were locked and do other things necessary for the safety of trains passing over the road. On the night of the accident, which occurred shortly after ten o'clock, he was engaged in his duties and

about 9.50 o'clock stopped to eat his lunch at the office of the operator at Eckhart Junction, which is at the west end of the Narrows. He remained there until ten o'clock when he went west, carrying a lighted lantern, his tool sack, hammer, spikes and a water bucket. He was killed a short distance east of the bridge over Will's Creek at a point about half a mile west of Eckhart Junction and about that distance east of the junction of the Pittsburg & Connellsville Railroad with the C. & P. R. R.

The night of the accident, an engine of the appellant, known as No. 1717, was hauling one of its freight trains from Connellsville to Cumberland, and when it reached Ellerslie, a village about two or two and one-half miles west of Mt. Savage Junction, the train parted leaving the rear end near Ellerslie, and the engine with the rest of the cars went on towards Cumberland. The operator at Mt. Savage Junction tower noticed that the train was broken, as the engine and cars attached passed his tower. He gave with his lamp the broken train signal, but the engineer could not see it. He telephoned to the operator at Eckhart Junction to give that signal, which he did, and the train was stopped and the engine went to what is called Red Rock switch-box, which is at the east end of the Narrows. The trainmaster of the C. & P. R. R., who had control of the running of trains between Cumberland and Mt. Savage Junction, instructed the operator at the latter place to order the engine to go back to Ellerslie, after the rest of the train, on what is spoken of as the middle track. He did so and the engine crossed over from the third to the middle track, running backwards to Mt. Savage Junction, and the appellees contend that while so running that engine killed young Logsdon. The track furthest to the right in going west from Cumberland is the one used for west bound trains; the middle track is used for east bound passenger and fast freight trains, and the third is the one generally used for east bound slow freight trains.

There are eleven bills of exception in the record—the first six present the rulings of the trial Court in refusing to exclude

evidence objected to by the defendant; the seventh embraces a prayer seeking to take the case from the jury at the conclusion of the plaintiff's testimony, which was refused; the eighth and ninth are the exceptions of the defendant to the refusal of the Court to admit an agreement between the C. & P. R. R. Co., and the P. & C. R. R. Co., in reference to the use of the tracks; the tenth was to allowing a witness to testify in rebuttal as to what the engineer said at Mt. Savage Junction about there being a light on the tender, and the eleventh includes the prayers.    Four prayers were offered by the plaintiff, all of which were granted except the second, and the defendant offered ten, all of which were rejected excepting the fifth which was granted as modified by the Court.

As the defendant proceeded with its testimony after the rejection of its prayer offered at the conclusion of the plaintiff's evidence, it waived its exception presented by the seventh bill, and therefore it cannot be considered by us, but it renewed that prayer at the end of the testimony, and it presents the important question to be determined by us, namely, whether there was legally sufficient evidence of negligence on the part of the defendant, which caused the death of young Logsdon to be submitted to the jury.    The appellees rely on what may be classified into three items of evidence which they claim to have been sufficiently established to justify the ruling of the trial Court in rejecting that (the eighth) prayer of the defendant—running the engine westward on an east-bound track on a dark night, not having any light on the west end of the tender or giving other sufficient signals, and the failure of the engineer to see Logsdon or not to avoid the injury if he did see him. While we, for the purpose of giving these three items of evidence full consideration, will to some extent consider them separately, we will not overlook the fact that all of them are more or less connected together, and each must be considered in the relation it bears to the others.

If it be conceded that engine No. 1717 did cause the death of this young man, it is clear that the mere running of the engine backwards, in a westerly direction on an east-bound

track, was not of itself sufficient evidence of negligence to jus-tify a recovery—certainly not under the testimony in this case. The uncontradicted evidence is that a train going west was using the west-bound track—indeed the trainmaster testified that there were two trains standing on that track when he gave the authority to run the engine west on the middle track.    The engine could not go back on the third track by reason of the cars that were connected with it being there, and as the west-bound track was then in use by the trains enti-tled to it, the middle track was the one that would naturally and properly be used.    The orders were given to the operator at Mt. Savage Junction and he could therefore keep that track clear—block out any east-bound trains until the engine cleared that track—and the testimony shows conclusively that in case of an emergency such as this, it was proper to use the east-bound track for this engine between Red Rock where it was and Mt. Savage Junction, where it would leave the C. & P. road, to go after the portion of the train left behind.

It must be conceded that although it is not negligence to use under such circumstances a track for an engine going in an opposite direction from that for which the track is primarily intended, it is the duty of the agents in charge of such engine to adopt all reasonable precautions to avoid injuring those who have the right to be, and may be, on the track.    It is shown that Mr. Logsdon not only had the right, but it was his duty to be on or about that track, and therefore no negli-gence can be attributed to him merely because he was there, and the question must be determined from the standpoint of one rightfully on the railroad.    When an engine is run back-wards, under such conditions as this record discloses—over the track of another company on a dark night in a gorge of a mountain, and where the trackwalker and possibly other employees of one or both of the railroad companies are liable to be in the discharge of their duties—there unquestionably ought to be a light at the end of the tender, and if any one, who is rightfully on the track, is shown to be killed or injured by reason of the failure to have such light or some sufficient

warning of the approach of the engine, the railroad company
may be liable, unless exempt because the negligence was that
of a fellow-servant, or there was contributory negligence on
the part of the person injured or killed, or there be some ex-
cuse recognized by the rules of law applicable to such cases.
As the appellees contend there was legally sufficient evidence
of the absence of a light, we will see what the record discloses
as to that.   H. A. Duvall, who was a brakeman on the train
to which the engine had been attached, was called as a wit-
ness for the plaintiffs.   After the train separated he went from
the part left behind to Mt. Savage Juuction and was there
when the engine came back from Red Rock.   He was asked
whether he saw any lights or signals on the engine.   The de-
fendant's counsel objected to the question and one of the
plaintiff's counsel stated that "the offer was made in connec-
tion with the offer to show that at the upper end of the Nar-
rows, about three hundred yards below the point of the acci-
dent, there was no light burning on the tender, and beyond
the point of the accident at Mt. Savage Junction there was no
light burning."   The Court then permitted the question to be
asded and he replied, "No sir, none that I could see."   He
also said "Whenever we are running backwards we generally
have the lights on the rear end," and in answer to the ques-
tion whether that was the rule he said, "Yes sir, they are sup-
posed to have a light."   He also said that the lanterns were
in the engine, that he saw two, red and white, which was the
usual number.   On cross-examination he stated that the place
of accident was in his judgment half a mile from Mt. Savage
Junction, that he did not know whether there was any light
there when the accident happened, or whether there was any
on the tender.   He was called in rebuttal, and on being asked
what he said to the engineer about the light, he replied, "I
asked him, did he leave a light out, and he says yes, and I
says, where is it now, and the light was setting in the engine,
and I don't just remember what he said to me about the light,
but he says that he had taken the light off the end of the
tank to see the man, that he didn't have any torch."   On

cross-examination he was asked, "He told you that at the time of the accident, at the place of the accident, he had a light on the tender?" to which he replied, "Yes sir." Adam Brown, who was the operator at Eckhart Junction, was also called by the plaintiff, and his evidence on that subject was as follows: "Q. Was there any light on the tender going west? A. That I cannot say. Q. Did you see any light? A. I was engaged in taking the number, and if he had a light on I didn't see it. I was engaged in taking the number of the two engines, one going west on the middle track and one going west on the west-bound track. Q. You are trying to give a reason why you did not see it; did you (see) any light? A. I cannot say. Q. Can you say whether you saw it or not? A. No, I cannot say whether I saw it. Q. Why can't you? A. I was engaged in taking those numbers. Q. Did you say you did not see any number? A. I was looking at the number on the headlight." He also said that it was his duty to take the numbers of the engines. That is all the testimony offered by the plaintiffs on this subject, excepting on the cross-examination of Mr. Jones, who was the switchman at Red Rock, he was asked, "Q. Do you know anything about the lights on the tender when they started out?," to which he replied, "Now sir, I am not positive; I am not positive about the lights being on the tender, but I saw with my own eyes the fireman with one white lamp in between the firebox and the tender," and on being asked "What was he doing with it?" replied, "I do not know what he was doing with it, that is something I could not tell."

Matthew McMillan, the engineman, who was called by the defendant, testified that he saw the fireman take the lantern and put it on the rear end of the tender—that it was his duty to instruct him to do so, and "see that it was done beyond a doubt;" that after putting the lamp on the rear end of the tender he proceeded backwards. He also said "every little piece that I would go I would blow the whistle and I instructed the fireman to ring the bell, which he done, and when he was not ringing it, or happened to fire, I had the

bell rope which went around both sides the engine, and I rang it myself." He said that when he was about two engine lengths from the first bridge west of Eckhart Junction, his attention was called to the rattle of a bucket, he went back and found a body lying on the side of the track, between the two east-bound tracks; that he had no torch on his engine and he got the fireman to get the light at the rear end of the tank, that it was the same lantern set on the tender before starting, and it was burning when brought to him by the fireman. On cross-examination he said he had two white lights burning on the front on the engine, a headlight, a cab light, a guage light and a red and white light burning to protect the rear of the train; that the white light was placed on the tender and the red light was in the cab; that the rules only required one light in running the engine backwards. He swore positively that the light was on the tender, and his fireman, W. L. Rutherford, corroborated him fully as to that and also swore that when the engine was stopped he got the lantern, which was still lighted, from the tender. The fireman also corroborated the engineman as to the ringing of the bell and the blowing of the whistle as they went backwards. The only contradiction of that testimony on this subject is the evidence of Duvall that the light was not on the tender when they reached Mt. Savage Junction. No one contradicted them otherwise as to the lantern being lighted at the time of the accident. The operator at Eckhart Junction swore positively that he could not say whether or not he saw one, as he was engaged in taking the numbers of this and the engine on the west-bound track. Mr. Jones said he could not be positive about that, although he did say he saw the fireman with a white lamp between the firebox and the tender. That might be so without in any way contradicting the engineman and fireman, as it could have been placed on the tender after he saw it, without his noticing it, when he was engaged in his work of switching the engine over to the other track which he did, or even afterwards. If Duvall's evidence be accepted as correct, and of course it must be in passing on this prayer, it

would only prove that the lantern was not on the engine at Mt. Savage Junction, and the plaintiffs proved by him that the engineman said the light was on the tender at the time of the accident, and he had taken it off to see the man. It might possibly be that when the engineman saw this unfortunate young man's body lying there, in the condition described by him and the other witnesses, he would neglect to see that it was replaced on the tender before starting. There is no denial of the fact that he did take the lantern from some part of the engine. If the uncontradicted evidence did not show that there had been this use of the lantern at the place of the accident, and especially if the engine had been run without any stop from the time it left Red Rock until it got to Mt. Savage Junction, an inference might be drawn from the fact that it was not on the tender, but was on the engine, when it reached the latter place, that it was not on the tender when the accident happened. But inasmuch as there was this intermediate use of the lantern, it would be going very far to hold that the evidence of Duvall was legally sufficient to overcome the positive testimony of the engineman and fireman that the lantern was on the tender at the place of the accident. In *State use Miller* v. *B. & O. R. R. Co.*, 58 Md. 221, the Court said that the evidence of three witnesses that they saw no brakeman on the cars after they had stopped and the accident had happened, was not inconsistent with that of the engineer, who testified positively that a brakeman was on the cars while they were in motion.

But in addition to that there is not a particle of evidence that the absence of the light was in any way connected with the accident. Mr. Logsdon left Eckhart Junction about 10 o'clock—going west on the middle track. He was in the office of the operator at that point when the signal came that the engine would go on that track and the operator so told him, although he apparently was under the impression that it could not cross over to that track until he came back. Mr. Brown said, "He told me if this engine was going to cross, that they would have to wait until he came back." Why he

had such impression the record does not show, but about ten minutes after he had started the engine passed Eckhart Junction going west on the middle track.    There was no contradiction of the engineer and fireman as to the blowing of the whistle and the ringing of the bell.   The west-bound freight train was passing the place of the accident at the time this engine did.    McMillan testified that the engine of that train was about four lengths of an engine ahead of him at that place. There is nothing to show what young Logsdon was doing at the time.   The noise of the west-bound train may have prevented him from hearing this engine, or that may have attracted his attention in such a way as to cause him not to observe this engine.    There may be many conjectures as to what caused the accident but it was utterly impossible for the jury to have known from the evidence in the record that it was caused by the absence of the light, even if it be conceded that there was none on the tender.   A verdict therefore based on that would be founded on a mere possibility—a conjecture or guess.   It is well settled in this State that in order to recover, the plaintiff must not only prove negligence on the part of the defendant, but that said negligence caused the injury complained of.   In *State, use Bacon* v. *B. & P. R. R.*, 58 Md. 484, this Court said:  "In actions like the present, to recover damages for personal injuries suffered by the alleged negligence of the defendant, it is incumbent upon the plaintiff to prove, 1st, that there was a neglect of duty by the defendant, and secondly, that the injury sustained was the direct consequence of neglect of duty."   In *Benedick* v. *Potts*, 88 Md. 54, CHIEF JUDGE McSHERRY stated the principle thus:  "It is a perfectly well-settled principle that to entitle a plaintiff to recover in an action of this kind, he must show not only that he has sustained an injury, but that the defendant has been guilty of some negligence which produced that particular injury.   The negligence alleged and the injury sued for, must bear the relation of cause and effect.   The concurrence of both, and the *nexus* between them, must exist to constitute a cause of action."   In *C. & P. R. R.* v. *State, use Millslagle*, 73 Md. 74,

the engine drawing a train of five or six cars was running backwards, with the tender in front, in the city of Cumberland. The evidence of the plaintiff tended to show that it was running at a speed prohibited by ordinance, and in violation of the rules of the company requiring the whistle to be sounded for stations and crossings, and the bell to be rung, but it was held "that the Court erred in refusing to take the case from the jury, because, conceding there was negligence on the part of the appellant's employees, still there is not the slightest proof connecting the injury with that negligence, and showing that the injury sustained was the direct consequence of such neglect of duty. * * * It may be assumed that the cars were going at a rate of speed forbidden by the ordinance of the city and that the rules of the company were violated in respect to signals of approach ; yet it must appear, as was said in *Phil., Wilm. & Balto. Railroad Co.* v. *Stebbing,* 62 Md. 517, that 'the negligent breach of the duty imposed by the ordinance was the direct and proximate cause of the injury complained of, and that such injury would not have occurred but for the violation of that duty.' " Many other cases have been decided in this State and elsewhere to the same effect but the law is so thoroughly established that it would be useless to cite them. The difficulty generally is in applying the principles to the facts of a particular case—especially for the lower Court which does not have the advantage of a printed record, from which the facts can be more readily gathered and more thoroughly considered than is possible in the progress of a trial at *nisi prius.*

The other ground relied on by the appellees as evidence of negligence is the failure of the appellant's agents on the engine to see young Logsdon and to avoid the injury. It was proven that when he left Eckhart Junction he carried a lighted lantern, and it is argued that if the defendant's agents had been on the lookout as the circumstances required, they or one of them would have seen him or his lantern. But here again, we are required to indulge in mere conjecture in order to sustain the appellee's position, and that too in the face of

the positive evidence introduced by the appellant. There is no evidence that Mr. Logsdon's lantern was lighted at the time of the accident. It is possible that for some reason it was not, but if we assume that it was we can readily understand how it might not have been seen if the engineer was, as he testified, looking in the direction he was going. If Mr. Logsdon had placed his lantern on the road-bed or a cross-tie, while making an examination or some repairs in the line of his duty, and was east of the lantern, he might have been between it and the approaching engine. The lights from the train going west might under those circumstances have prevented the engineman from noticing the light from the lantern, which would be reflected to either side of Mr. Logsdon, if there was any. The plat filed shows there is a slight curve to the right for some distance east of the place where the accident occurred. The engineman was on the left side, going backwards. His view would thereby be somewhat cut off from a point west of him, and the tender would necessarily obstruct it to some extent, especially if the lantern was on the ground or even hanging in Mr. Logsdon's hand. The fireman said he was standing down by the firebox. His duties necessarily require him to be there much of the time, especially if his statement was true that he was having trouble with his fire and "the steam was going back right along." There was no evidence whatever that the engineman did see Mr. Logsdon before the accident, and as it is not shown where he was, there can be no such question as sometimes arises in cases of this character, as to whether the accident could have been avoided after discovering the injured party on the track. There is nothing to meet the positive statement of the engineman that he did not see Mr. Logsdon, although looking in that direction, excepting the bare fact that about twenty-five minutes before the accident he started up the track with a lighted lantern, and there is a total absence of testimony as to what he was doing or how the accident occurred. Manifestly that is not sufficient under the authorities applicable to such questions.

We find nothing in the record that could possibly support

the charge of negligence beyond what we have considered. The death of a young man in full health, especially one of such a character as the record shows Mr. Logsdon to have been, is greatly to be deplored, and the loss to parents of such a son cannot well be estimated by others, but the law does not authorize a recovery under such circumstances as this record discloses. It will, therefore, not be necessary to pass on other questions in the case, but assuming the evidence admitted by the Court below to be admissible, and giving it and the other testimony all consideration that the law permits or requires, we are forced to the conclusion that we must reverse the judgment, on account of the refusal of the Court to grant the defendant's eighth prayer, and as there can be no recovery we will not award a new trial.

> *Judgment reversed, without awarding a new trial, the costs to be paid by the appellees.*

(Decided June 20th, 1905.)