PATRICK CONCANNON *vs.* JAMES C. DAVIS, ·Agent.

Cumberland.     Opinion March 12, 1924.

*A finding by a jury that defendant was guilty of negligence, and also that plaintiff was free from contributory negligence, would be warranted under the facts in this case.*

In this case a jury would be warranted in finding the defendant guilty of negligence under the facts, in moving a train over this dead line without any previous warning, in having no watch or look-out on the tender of the engine which was pulling the train, and no one at the switch to caution employees, in short in converting a place of comparative safety to one of peril without any notice to employees likely to occupy it in the performance of their duties.

A jury also would be warranted in finding the plaintiff free from contributory negligence, which in any event can only be considered in connection with damages.

On report. An action to recover damages for personal injuries sustained by plaintiff in the yard of the Portland Terminal Company while in its employ by being caught and pinched between the tender of a locomotive and a bulkhead on a buggy track, so called. At the conclusion of the evidence before a jury, by agreement of the parties, the case was reported to the Law Court under a stipulation that if the evidence would sustain a verdict by a jury for the plaintiff the Law Court to assess damages, and· if the evidence would not sustain a verdict by a jury for the plaintiff, judgment to be for the defendant. Judgment for plaintiff for $10,000.

The case is fully stated in the opinion.

*Joseph E. F. Connolly,* for plaintiff.

*Charles B. Carter, of White, Carter & Skelton,* for defendant.

SITTING:   CORNISH,   C.   J.,   HANSON,   PHILBROOK,   WILSON,
DEASY, JJ.

CORNISH, C. J.   This is an action of tort brought under the
Federal Employer's Liability Act, which is admittedly applicable,
to recover damages for injuries sustained by the plaintiff in the yard
of the Portland Terminal Company.   It is before the Law Court on
report under a stipulation which will be considered later.   The record
is voluminous but there is little contradiction on the essential points.

The topographical situation as clearly stated in the brief of
the learned counsel for the defendant, was this:   The Portland
Terminal Company, transfer agent and switching corporation, own-
ing terminal facilities used by both the Boston and Maine and
Maine Central Railroad Companies, has in Portland or had at the
time this accident occurred, eight or nine switching yards the purpose
of which is to take the incoming freight trains from both roads, break
them up, reclassify the cars, part for delivery and part for through
shipment, make up the new trains and deliver them to each of the
connecting roads ready to be started on the way to their destination.

Among others is yard No. 8 where this accident occurred, and
which is situated between Commercial Street on the north and Fore
River on the south.   The tracks in the yard run in a general easterly
and westerly direction.   Four main line tracks come in from the west,
at what might be termed the neck of the yard and then spread out,
fan-like toward the east making about forty tracks in all in the
extreme easterly portion.   We are concerned in this case, however,
only with the section at or near the neck comprising the four main
line tracks into which all of the switching tracks converge, and the
caboose or buggy track, so called, at the extreme north just beyond
what is known as main line track No. 2.   This buggy track runs
alongside a bulkhead about 300 feet long and four and one half feet
high, built of railroad sleepers placed on end.   This bulkhead was
originally constructed for loading or unloading purposes but for many
years has not been used except at very rare intervals and then at the
western end by the Telephone Company for the loading and unloading
of poles.

The buggy track is so called because it is used for the storage of
buggies or caboose cars in which the freight train crews keep their
personal belongings.   Each buggy comes into the yard with its

respective train and is stored on this track until that particular crew goes out again, when it is attached to the rear of the outgoing train. The accompanying sketch, reduced from a plan in the case, may be of assistance in understanding the locus.

The accident happened as follows: A little after seven o'clock on the morning of July 15, 1919, the plaintiff, who was a section hand in yard 8, was ordered by his foreman to get some tie plates for use in laying rails. These were kept in various places, sometimes around the workmen's shanty near the southern or river side of the yard, sometimes near the coal shed, a little easterly, and sometimes on the above described bulkhead at the north. The plaintiff found no suitable ones at the shanty, was told there were none at the coal shed by two workmen coming from that direction, and therefore he started northerly across the intervening tracks for the bulkhead. When he reached outward main line number two, just south of the buggy track, he saw a shifting engine with seventeen freight cars on the side-track nearest Commercial Street moving slowly westerly in his direction. The engine was then some distance easterly of the switch connecting with outward main line number two, and also easterly of the switch connecting with the buggy track. The engine was backing, tender first and was pulling the train. The plaintiff, assuming that the train would take main line number two, as always in his experience of over eight years such trains had done before, kept his course, crossed main line number two and the buggy track, stood between that track and the bulkhead, a distance of about two and a half feet,

and began to look around for tie plates, unsuspecting any danger, when suddenly he realized that the train instead of taking the main line, as he had expected, had taken the buggy track and the tender was right upon him. It was too late then for him to extricate himself. He shouted, but saw no one on the engine and no one on the engine saw or heard him. He clung as close as he could to the bulkhead, but his body was pinched between the tender or engine and the bulkhead, his right hip crushed and other injuries sustained. Hence this action.

At the conclusion of the testimony instead of submitting the case to the jury it was reported to this court with the stipulation that "if the evidence would support a verdict for the plaintiff, the Law Court is to assess damages for the plaintiff; If the evidence would not sustain such a verdict judgment is to be rendered for the defendant."

In other words the Law Court is to examine and pass upon the evidence as if a verdict had been actually found by the jury in favor of the plaintiff and the case were here on a general motion by the defendant to set it aside as against the evidence, the only difference being that no damages have been assessed.

Is then the assumed verdict for the plaintiff manifestly wrong? That is the clear cut issue.

## I.  DEFENDANT'S NEGLIGENCE.

The writ contains ten counts, five at common law and five under the Federal Employer's Liability Act. The former are abandoned. The claims under the latter, as supported by the evidence, may be condensed as follows:

Under the long established system of operation in the defendant's yard, recognized and fully appreciated both by the employer and the employees, the buggy track on or at the side of which the accident happened had been exclusively devoted by the Terminal Company to storage purposes for a long period of years, at least during all the eight years and a little more during which the plaintiff had worked in that yard. While that track was connected with other tracks by a switch both at its easterly and westerly end, yet the one at the westerly end had been used almost exclusively. The buggies were set on to the storage track from that end or were "kicked" on, to use the language of the train men. And they were almost always removed at the same westerly end. Occasionally a buggy might be

taken off by a switching engine at the easterly end if the presence of a long string of buggies to the westward rendered that method more convenient. But this was of rare occurrence.

Moreover, section men sometimes temporarily stored their hand-cars or lorries on this buggy track, when working on the main line in that vicinity. At times the switch at the easterly end had been spiked so that neither entrance nor exit could be made at that point. The other tracks in the yard were regularly inspected but not this buggy track. Its rails had become rusty from disuse so that it looked to be as it was a storage track pure and simple. All this was common knowledge in the yard.

Only once during the eight years covering the plaintiff's term of employment had a train been moved over the buggy track. That happened five years or more before the accident and on that occasion the Company, appreciating the danger arising out of the changed condition and apparently also its own responsibility, gave express warning to the yard employees in advance, in order that they might protect themselves. The foreman of that section notified the section men "to be careful about the buggy track as they were going to use it." This fact is uncontradicted, is proven by testimony both from plaintiff and defendant and is most important and significant.

Its use on this particular morning was occasioned by an emergency. An accident had happened the night before on some portion of the main line toward the west preventing the passage of trains over main line number two and for that reason the defendant brought the buggy line into requisition. No notice however, of this proposed change was given. No warning was communicated to the section men, regardless of the legal duty resting upon an employer to notify employees when without their knowledge a safe place in which to work is suddenly changed into an unsafe and perilous one.

Not only was the unwarned change itself accompanied by danger to the workmen, but no precautions were taken to protect them from the moving train after it had started. The fireman was coaling the locomotive at the time and under the rules of the road and under the dictates of ordinary precaution additional responsibility was then thrown upon the engineer to look out for trouble in the direction in which the cars were moving. But the cab was concealed from the track by the tender and the engineer was looking toward the rear of the train taking signals from the head brakeman who was on the

train six cars back, and he from the second brakeman who was still further back. Furthermore there was no watch or lookout on the tender as it moved from its regular course upon and over this irregular and unusual course, no one to give warning to persons who might be upon or near the buggy track nor to signal the engineer in case of need or emergency. Nor was anyone at the switch to give such warning either by his word or acts or mere presence in that location.

It may be true that the automatic bell was ringing on the engine, but that was usual when the engine was taking its customary course, and gave no indication or warning that it was to take the other track. In short the Company was pulling its train into this storage track without the slightest warning or attempt at warning to employees who in the course of their duties might have occasion, as did the plaintiff, to go upon and about it, a thing it had never done before. The whole situation constituted a trap, not designedly of course, but none the less effectively set to catch not strangers unacquainted with the ordinary situation, but to catch employees of long standing whose very knowledge and experience made them the innocent victims of the defendant's negligence.

Under all these circumstances, we have no hesitation in declaring that a finding of the jury that the negligence of the defendant had been proven should not be disturbed. Granting that the defendant had the legal right to use its own property for its own legitimate purposes, yet the use of one's property in disregard of the legal rights of others liable to be affected or injured thereby is the very gist of negligence.

The defendant seeks to avoid legal liability by invoking the doctrine laid down by the U. S. Supreme Court in the leading case of *Aerfetz* v. *Humphreys*, 145 U. S., 418, where it is held that persons having direct charge of a switching engine and cars upon the tracks in a railroad yard "have a right to act upon the belief that the various employees in the yard familiar with the continuously recurring railroad movement of the cars would take reasonable precaution against their approach," that the railroad company under those circumstances "is not compelled to send some one in front of the cars for the mere sake of giving notice to employees who had all the time knowledge of what was to be expected." This doctrine is followed in many other cases and is undoubtedly sound. The very nature of the railroad business demands such a doctrine. It is but a declaration that the employer

is not bound to guard and warn the experienced employee against what is to be expected in the ordinary and natural course of the business, and the employee must look out for that himself. A railroad switching-yard is a place of known danger, with its frequent and almost continuous movements of engines and cars.

But the distinction between the facts in that line of cases and in the present is sharp and clear. It is that between the peril connected with passage across an actively used traffic track and a practically dead storage track. Had the plaintiff been injured while crossing any of the tracks before reaching the storage track this doctrine might be effectively invoked. But when he reached the storage track, the danger of passing trains had ceased, and another situation arose. What was to be naturally expected there, applying the same legal rule, was the danger from cabooses kicked on from the west, and nothing else. That he was expected to look out for and he says that he did. He looked toward the west where danger might lie. He did not look toward the east for a peril that had never been created before. Nor was he bound to do so. The duty then was shifted to the defendant to see that he and his co-employees were seasonably warned of the change.

No step was taken toward that end and the negligence of the defendant as assumedly found was not a clearly wrong finding.

## II. ASSUMPTION OF RISK.

The defendant further urges that the plaintiff assumed the risk and therefore cannot recover. This defense is a bar to recovery under the Federal Employer's Liability Act if the facts warrant its application. But here they do not. The assumption of risk on the part of an employee necessarily implies prior knowledge of the conditions from which the accident happens. *Clement* v. *Maine Central R. R. Co.*, 117 Maine, 45. That condition here is the passage of a train over the storage track. Of this the plaintiff was admittedly in utter ignorance. He did not know of the risk, had no reason to know it, and therefore he cannot be held to have assumed it.

## III. DAMAGES.

The plaintiff was a man fifty-three years of age and in good health. His injuries were grievous and permanent. His right hip and leg

were crushed. The bones of the leg have only partially united and the leg will never be of much use according to the surgical testimony. A serious infection of the leg followed the injury necessitating three or four operations. He was in the hospital one year and eight months of which time he was confined to the bed for one year. He wore a plaster cast for eight months. He can move only by the aid of crutches. His suffering has not wholly ceased. The hospital expenses amount to $1,591. He was earning $3.20 a day at the time of the injury. His earning capacity now is very substantially reduced. Considering all the legal elements that enter into the measure of damages, and also the present purchasing power of a dollar, it is the opinion of the court that $10,000 is a fair award.

## IV. CONTRIBUTORY NEGLIGENCE.

Under the Federal Employer's Liability Act, contributory negligence on the part of the plaintiff is not a ground of absolute defense, but may serve to diminish the amount of damages to which the plaintiff might otherwise be entitled.

The defendant invokes such diminution here in case actionable negligence is attributed to the Company.

But we are unable to discover want of due care on the plaintiff's part. He acted as the ordinarily prudent man should have acted under the same circumstances. The same element that enters so largely into the negligence of the defendant favors the plaintiff on the question of his own due care, namely, the sudden and unexpected and unwarned use of a hitherto unused track. When inquired of in regard to his crossing the various tracks from south to north, he said: "I looked up and down the tracks every time I crossed every one, . . . . Looked up and down the tracks for fear of any trouble coming." As he neared track number two he saw the shifter and cars backing up, tender first, and he warned a fellow workman who was with him to look out for it, thus showing his own alertness. The train was then east of the easterly switch. It was a common occurrence for such a train to be on that track leading into outward main track number two at that time. It was in accordance with the universal method of work in that yard for the train to pass on to that track and he naturally expected this one to do the same. He had a right to so expect. Only on one occasion had the Company used the

buggy track for a train and then the men had been duly and season-ably warned.   He had left track two within the zone of danger and crossed on to the buggy track the supposed zone of safety, at least from trains moving from the east.   The only danger which he then had reason to apprehend was from buggies kicked down from the west, against which he had been instructed to be careful when crossing over this track, and he says that he was watching for such a kick down.   In other words as a prudent and careful man, attentive to his business and watchful for his own safety, he was guarding against the only peril to which he had reason to believe he was exposed, and paid no further attention to the peril which he had good reason to suppose had ceased when he cleared track number two.   All this is reasonable and convincing.   Again the defendant cites the switch yard cases before referred to, and again they do not apply.   When he was on that portion which the Company had devoted to transportation the doc-trine of those cases was in point, and it appears that he was vigilant, as he should have been, in looking both ways.   When he had left that portion behind and reached the storage track, those cases ceased to be precedents.   The defendant itself had lulled the plaintiff into a sense of absolute security by its long continued use of the buggy track, and he must not be held to have failed in due care because he did not watch to determine whether the approaching train would leave the track it had always taken during his eight years of personal experi-ence, with one exception when due warning was given, and take another track that had been free from the passage of trains during all that time.

To hold the plaintiff guilty of contributory negligence under the facts of this case would be contrary to what we conceive to be good law and good sense.   Therefore the award is not to be diminished by any contributing fault of the plaintiff and the entry should be,

*Judgment for plaintiff*
*for $10,000.*