## Elder v. Pennsylvania Railroad Company, Appellant.

138

Argued April 30, 1935.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, PARKER, JAMES and RHODES, JJ.

*John R. Bredin,* with him *Dalzell, McFall & Pringle,* for appellant.

*J. Thomas Hoffman,* for appellee.

OPINION BY PARKER, J., July 18, 1935:

In this workmen's compensation case, Ida May Elder made claim on account of the death of her husband, Homer Elder, and it was admitted that he died as the result of an accident occurring in the course of his employment with the defendant company. The referee made an award, which was affirmed by the board, and judgment was entered by the court of common pleas. The sole defense is that, at the time of the accident, Elder was engaged in interstate transportation and within the terms of the Federal Employers' Liability Act (35 Stat. L. 65, chap. 149, U. S. Comp. Stat. Supp. 1911, p. 1322). Unfortunately, neither the proofs nor findings of facts by the referee or board were as clear and specific as would be desirable to determine the legal question involved, and it will therefore be necessary to refer in some detail to the evidence and findings.

The claimant offered evidence tending to show that the deceased was, on July 7, 1932, sergeant of police in the employ of the Pennsylvania Railroad Company; that it was his duty to police the trains, tracks, and freight houses of that portion of the Panhandle Division of the defendant company which extended from "Pittsburgh to the Pennsylvania State Line, up to Washington [Pennsylvania]" and to arrest trespassers and train riders, inspect the trains, and watch for open car doors and for cars being robbed. On the evening

of July 7, he was engaged at his work in the vicinity of the Point Bridge at Pittsburgh where repair work was being done and trains which ordinarily used four tracks were limited to the use of one track, creating what was known and described by the railroad employees as a "gauntlet." This arrangement necessitated the slowing of the speed of trains with the result that train riders, referred to in the testimony as "bums," gathered at that point for the purpose of stealing rides and had, on several occasions, robbed cars. Shortly after six P. M., Elder was sitting in Esplen Tower, which was located two miles west of the gauntlet, when he was called by his superior officer, Captain Shumaker, and given some instructions for the guidance of himself and Sergeant Boyce, a fellow officer who was in the tower at the time. Boyce was called as a witness by the claimant and testified that Elder told him: "We are supposed to go to the gauntlet and chase the bums off the right-of-way, and keep them from getting on the train," a scheduled freight train known as VL-7. This train was due to arrive at Esplen tower shortly after eight o'clock and, in the meantime, the two officers started toward the gauntlet. Before the freight train arrived, the officers drove a number of trespassers from the tracks and when the time arrived for the approach of the train, Elder stated that he had to answer a call of nature and the two separated. Boyce proceeded to remove some trespassers from the train and did not see Elder again until 8:15 P. M., when he found his dead body in the vicinity between the passenger tracks. It appeared by the undisputed testimony of the company's witnesses that train VL-7 was a freight train running on regular schedule from Harrisburg, Pennsylvania, to St. Louis, Missouri, and that the division on which the accident occurred was known as the Panhandle Division and extended from Pittsburgh to Columbus, Ohio. It likewise appeared by that testimony that the train con-

sisted of one hundred ten cars, of which seventy-four were loaded and of which latter number at least sixty-seven were destined for points beyond Columbus, thus establishing the fact that the train consisted largely of interstate shipments.

It was the contention of the defendant that, at the time of Elder's death, he was involved particularly in protecting an interstate shipment, to wit, freight train known as VL-7. As we have indicated, the findings of fact of neither the board nor referee were as specific as they should have been and consisted in part of mixed findings of law and fact and conclusions. With relation to the subject in controversy, the board substituted its own finding for those of the referee as follows: "At about 6:15 P. M. on July 7, 1932, decedent, by telephone, received instructions from a superior, in which he was directed to go with another policeman to the vicinity of Point Bridge and drive off the company's premises a crowd of trespassers who had assembled there. This the decedent and his co-worker did, and after the trespassers had been driven off decedent told the other policeman that he wished to perform an act of personal ministration. He left the other policeman for the purpose of doing so, and later was found dead, the result of accidental injuries. There is no evidence that he was engaged in performing any duty in connection with an instrumentality of interstate transportation at the time of his accidental death, nor can the instructions which his fellow employee says were received by decedent fairly be construed as definitely relating him to such an instrumentality. We find that decedent at the time of his death was employed in the performance of a local police duty."

Although the fact is not specifically found by the board, the evidence is undisputed, taken from the records of the train dispatcher, that VL-7 was an interstate train carrying a number of cars in interstate

shipment. The finding of the board ignores the testimony of the claimant's own witness, uncontradicted, that they were to go to the gauntlet, drive off the trespassers, and keep them from getting on the train, and that the dead body of Elder was found just after the train had passed. Nevertheless, we will consider the legal position of the claimant, assuming the facts to be, as the board has found, that after the deceased had driven off some trespassers, he left "to perform an act of personal ministration;" that he was not seen again until he was found a few minutes later on the tracks of the company in the immediate vicinity of the point where train VL-7 passed. In other words, we will consider the legal position of the claimant on the assumption that the freight train had passed before Elder was killed, which is more favorable to her than the evidence warrants. We will therefore first examine the status of a railroad policeman whose duties are to drive trespassers from the tracks of a railroad extending from Pittsburgh to Columbus, over which were hauled both interstate and intrastate shipments, to protect both interstate and intrastate shipments of freight, inspect the car doors, and prevent theft of merchandise.

On the question involved, the decisions of the federal Supreme Court are controlling: Mayers v. Union R. Co., 256 Pa. 474, 100 A. 967; and the question is one of law when the facts are determined: Martini v. Director General, 77 Pa. Superior Ct. 529. In locating the line of demarcation between the fields of state workmen's compensation cases and of the Federal Employers' Liability Act, heed must be given to the exact terms of the federal statute which deals with interstate transportation, a part only of interstate commerce. "The true test of employment in such commerce in the sense intended is, was the employee, at the time of the injury, engaged in interstate transportation, or in work so closely related to it as to be practically a part of it?" Shanks v.

Delaware L. & W. R. Co., 239 U. S. 556, 558, 36 S. C. Rep. 188. "It will be observed that the word used in defining the test is 'transportation,' not the word 'commerce' ": Chicago & N. W. Ry. Co. v. Bolle, 284 U. S. 74, 78, 52 S. C. Rep. 59. The decisions clearly establish the rule that the status of the employee with respect to interstate commerce, where the service is separable, is tested by the work that he is actually performing at the time: Illinois C. R. Co. v. Behrens, 233 U. S. 473, 34 S. C. Rep. 646. Frequently, however, cases arise where the employment is concerned at the same time with both interstate and intrastate transportation and the two are not separable. "In Pederson v. Delaware, etc., R. R., 229 U. S. 146, 33 Sup. Ct. 648, 57 L. Ed. 1125, Ann. Cas. 1914C, 153, this court had occasion to consider the instrumentalities of commerce and to determine whether they should have intrastate or interstate character. The case was concerned with mechanism—tracks and bridges, but there was a human element as well, one that was engaged in keeping the mechanisms ·in repair, and, it was decided, that as they were instruments of interstate as well· as of intrastate commerce he was engaged in interstate commerce:" Philadelphia & R. Ry. Co. v. Di Donato, 256 U. S. 327, 329, 41 S. C. Rep. 516. That case went somewhat further than the Pederson case and held that a crossing watchman employed by a railroad company which was engaged in both interstate and intrastate transportation was employed in interstate transportation, or in work so closely related to it as to be practically a part of it, when the workman was engaged in flagging a train, whether the particular train was engaged in interstate or intrastate transportation, and that his widow was not entitled to recover under the Pennsylvania Workmen's Compensation Law, since the watchman's duty had other purpose than the prevention of disaster to one particular train. "It had purpose as well to the

condition of the tracks and their preservation from disorder and obstructions."

"As the federal law supersedes the state law, so do acts done thereunder, and where intra- and interstate acts are mingled, or at times alternate, there is no separation. The interstate feature predominates and by it must the questioned act be judged. 'To separate duties by moments of time or particular incidents of its exertion would be to destroy its unity ...... This service and the other service cannot be separated in duty and responsibility:' Philadelphia & Reading Ry. Co. v. Di Donato [supra]. Employment follows interstate transportation and begins when the workman, on a carrier's premises, makes a forward move to serve in that traffic or employment and ends only after he has completely dissociated himself therefrom. Interstate employment follows such character of commerce, if the instrumentality is wholly or partly engaged therein:" Koons v. Philadelphia & R. Ry. Co., 271 Pa. 468, 470, 114 A. 262.

We will endeavor to apply these principles to the case in hand. By Act of February 27, 1865, P. L. 225 (38 PS 31, et seq.), any corporation owning or using a railroad in this Commonwealth may apply to the governor to commission such persons as the corporation may designate to act as policemen for the corporation. If appointed and after qualifying, they have the power of policemen of the city of Philadelphia in the several counties in which they are authorized to act. Keepers of jails, etc., are required to receive all persons arrested by such policemen for the commission of any offense against the laws of this Commonwealth upon or along said railroads or the premises of any such corporation, and their compensation is required to be paid by the companies for which they are appointed. The deceased was a regular employee of the defendant company, and his hours of labor were from 4:00 P. M. for a period of

ten hours. The defendant company, at the time of the accident and at the place where the deceased was employed, was engaged in both interstate and intrastate transportation. His duty had as a purpose the protection of intrastate and interstate transportation indiscriminately. When he was called upon to drive trespassers from the tracks, it was as much in the interest of one kind of transportation as the other. It involved more than the "stealing of a ride" for such trespassers affected the safety of the operation of all trains and was for the protection of both kinds of shipments. Such an employee is in service not alone for the apprehension and conviction of those guilty of crimes, but is employed by the railroad company as an individual to protect its property and the property of shippers of both interstate and intrastate goods. His duties were not practically separable. Even when driving trespassers from the tracks it could not be said that at one moment he was engaged in the one kind of transportation and at another moment in the other. They are so interrelated that it is not practicable to distinguish them. We cannot distinguish the service of a railroad policeman in driving trespassers from the tracks under the circumstances that we have described from that of the flagman in the case of Philadelphia & R. Ry. Co. v. Di Donato, supra, who had flagged three interstate trains and then was engaged in flagging a train the character of which was not known.

The case of Erie R. R. Co. v. Winfield, 244 U. S. 170, 37 S. C. Rep. 556, bears a strong resemblance to the case we are considering. There an employee of a railroad carrier engaged in both kinds of transportation was leaving the yards after his day's work, which had included employment in both kinds of transportation, when he was killed, and it was held that he was not entitled to recover under the state workmen's compensation act as the Federal Employers' Liability Act

applied. The court there said: "Like his trip through the yard to his engine in the morning, it was a necessary incident of his day's work, and partook of the character of that work as a whole, and it was no more an incident of one part than of another. His day's work was in both interstate and intrastate commerce, and so, when he was leaving the yard at the time of the injury, his employment was in both. That he was employed in interstate commerce is therefore plain, and that his employment also extended to intrastate commerce is, for present purposes, of no importance."

In other jurisdictions the principles of the Di Donato case have been applied to workmen more closely resembling railroad policemen than in the Di Donato case. In Fitzgerald v. Great N. Ry. Co., (Minn.) 196 N. W. 657, a night watchman employed by a railroad company, engaged in both kinds of transportation, whose duty required him to protect freight against theft and trespass and look for persons riding trains, was held to be engaged in interstate commerce because "his duties were not practically separable." In So. Pac. v. Industrial Acc. Comm., 174 Cal. 8, 161 Pac. 1139, a gateman was flagging an intrastate train when a horse and wagon were caught by a descending gate, and the gateman was attempting to back the horse from the track when he was killed, and it was held again that the duties were not separable and he was engaged in interstate transportation. In Atchison T. & S. F. Ry. Co. v. Industrial Acc. Comm., 192 Cal. 765, 220 Pac. 342, the decedent was employed by the railroad, engaged in both interstate and intrastate transportation, to guard trains during a strike and was found dead alongside the tracks where he had been shot. It was held that he was engaged in interstate transportation, even though there was no evidence showing that he was directly engaged in facilitating a particular interstate act of transportation.

The case of Bauchspies v. Central R. of N. J., 287 Pa. 590, 135 A. 728, is also strongly confirmatory of our conclusion. There compensation was sought under the Pennsylvania statute for the death of an employee whose duty it was to care for switches and signals at a crossing and the batteries and other motive power equipment which operated them, and interstate as well as intrastate trains were operated over this crossing regularly by both railroads. Our own Supreme Court there held that the deceased's duties were so closely related to interstate commerce as to be a part of it. There was no evidence as to just what the deceased was doing when he came to his death, and it was held that his acts could not be split into separate acts of interstate and intrastate commerce.

In any event, the judgment cannot be sustained because the burden of proof was here on claimant to show that her decedent was, at the time, exclusively engaged in intrastate transportation. Viewing the evidence in a light most favorable to the claimant, there was no evidence that he was engaged in intrastate transportation. This principle was settled by the decision in Philadelphia & R. Ry. Co. v. Polk, 256 U. S. 332, 41 S. C. Rep. 518, which reversed the Supreme Court of Pennsylvania (266 Pa. 335, 109 A. 627). In the Polk case, the deceased employee was engaged as one of a crew handling both interstate and intrastate shipments. In reversing the state Supreme Court, it was · there said (p. 335) : "It would seem indisputable, therefore, if there be an assertion of the claim or remedy growing out of an occurrence in which there are constituents of interstate commerce the burden of explanation and avoidance is on him who asserts the claim or remedy, not on the railway company to which it is directed." Shortly after that decision by the federal court, our own Supreme Court had occasion to consider another case, Scanlon v. Payne, Director General, 271 Pa. 391, 114

A. 493. That was a workmen's compensation case where a train inspector was killed after inspecting four trains, the first three of which were interstate and the character of the last was not shown. Relying on the Polk and Di Donato cases, it was there held that "there is no presumption that the duties performed in works partaking of interstate and intrastate commerce were performed in the latter, but that the presumption, if any exists, might, in fact, be the other way."

We are satisfied that, even though we accept the finding of the board that Elder had completed an assigned task in connection with the movement of the freight train VL-7, his general duties were of such a nature that they were not separable and that the Federal Employers' Liability Act must, therefore, be held applicable, and that in any event, having failed to show that the deceased was engaged in intrastate commerce, the claimant has not sustained the burden of proof resting upon her. We do not mean to hold that it would not be possible for a situation to arise where a railroad policeman might be engaged in intrastate commerce to the exclusion of interstate commerce, but such is not the case here.

It has been the practice of this court, in dealing with workmen's compensation cases, to return the case for further hearing to give the claimant full opportunity to prove his claim even though the proofs as presented would not sustain a recovery, when it appears probable that if he had been properly represented and the facts developed, he would be entitled to recover. Here, however, it does not seem, from the proofs as offered, that the situation could be changed by a new hearing and that such reconsideration would be useful. It is, therefore, our duty to reverse the judgment.

Judgment reversed, and it is directed that judgment be entered for the defendant.