EDNA ALBRIGHT, CLAIMANT, *v.* THE PENNSYL-VANIA R. CO.

[No. 40, January Term, 1944. Reargued as No. 30, April Term, 1944.]

*Decided June 13, 1944.*

The cause was argued before SLOAN, C. J., DELA-PLAINE, COLLINS, MARBURY, GRASON, and BAILEY, JJ.

The cause was reargued before MARBURY, C. J., DELA-PLAINE, COLLINS, GRASON, MELVIN, BAILEY, and CAP-PER, JJ.

*Paul Berman,* with whom were *Morton P. Fisher* and *Eugene A. Alexander, III,* on the brief, for the appellant.

*Edward E. Hargest, Jr.,* for the appellee.

GRASON, J., delivered the opinion of the court.

The Pennsylvania Railroad, on the 24th day of January, 1943, and for some time prior thereto, maintained a produce terminal at the general location of North and Mount Royal Avenues, in the City of Baltimore. This yard comprises "about ten delivery tracks and about five

running tracks". To the side of the tracks is a long two-story shed. The second story is used for offices; the first floor (which is closed at night by drop doors) consists of platforms, where sample goods are displayed. This terminal is maintained chiefly for Baltimore brokers who deal, generally, in perishable goods (such as fruits and vegetables), which is shipped from points out of this State and delivered to them at this terminal. Some of the brokers rent platforms in this shed. Upon delivery of a car of produce the seal is broken, samples taken from the car, and displayed on these platforms. These brokers sell the goods shipped to them at the terminal and when sold the purchaser unloads the car. Other brokers do not rent platforms but break the seal and exhibit the products in the car direct to prospective purchasers, and when they sell, these cars too are unloaded by the purchasers. The terminal is open "from midnight until 3 P. M. the next day". No cars are unloaded on Sundays, except as hereinafter noted. Most of the freight received at the terminal is sold in Baltimore. If, however, the Baltimore market is inactive, some of this freight is reconsigned to points outside of Maryland. Most of the shipments received at this terminal, however, is sold in Baltimore and but a small portion of the freight is reconsigned. The freight destined for the terminal is received at the Mount Vernon yards, on the main line of the railroad; the cars are put on a siding, and from there delivered by switch engines to the terminal. "As soon as cars are placed, consignees are notified, either person to person or by telephone." They are given forty-eight hours after seven A. M. of the day of their notification by the railroad of the arrival of a shipment within which to move the freight from the car. On the night of January 23, 1943, there were one hundred and eight cars (loaded and empty) on the tracks at the produce terminal. Most of the goods shipped in these cars were for delivery in Baltimore. On the night of January 24, 1943, Clayton L. Albright sustained an injury at this produce terminal, of which he died on the 4th day of February, 1943. He was employed by the rail-

road as a special policeman and assigned for duty at this terminal. His hours were from 4 P. M. until 12 midnight. He was required to examine cars in the yard and those arriving while on duty, to determine whether seals on these cars were broken. If he found a seal broken he would apply another seal to the car, in order to safeguard the lading, and it was his duty to see that no theft was committed from the cars.

Edna Albright, widow of the deceased, filed a claim for compensation before the State Industrial Accident Commission, and, after a hearing, the Commission awarded her compensation. From this finding of the Commission the Railroad Company appealed to the Court of Common Pleas of Baltimore City. The case was tried, submitted to the jury, and the jury, by its verdict, sustained the Commission. Thereafter the railroad filed a motion for a judgment N. O. V., which motion was granted, thereby reversing the decision of the State Industrial Accident Commission of Maryland and from a judgment made absolute in favor of the employer and self-insurer, the claimant appealed to this Court.

At the trial of the case below there was but one issue submitted to the jury for determination, namely: "Was Clayton L. Albright, deceased, engaged in interstate commerce at the time he sustained the injury which caused his death?"

This involves the inquiry of whether the claimant's action, if any, was cognizable under the Federal Employers' Liability Act, 45 U. S. C. A., Sec. 51 *et seq.*, or under the Workmen's Compensation Law of this State, Code 1939, Art. 101, Sec. 1 *et seq.* Prior to 1939, if one was engaged in interstate transportation, or in work so closely related to it as to be practically a part of it, in the event of an accident to him while so engaged, his case came within the purview of the Federal Act.

"The Federal act speaks of interstate commerce in a practical sense suited to the occasion, and the 'true test of employment in such commerce in the sense intended is, Was the employee at the time of the injury engaged in

426

interstate transportation, or in work so closely related to it as to be practically a part of it?'" *Chicago, B. & Q. R. Co. v. Harrington,* 241, U.S. 177, 36 S.Ct. 517, 518, 60 L.Ed. 941; *Chicago & Eastern Illinois R. Co. v. Industrial Commission of Illinois,* 284 U. S. 296, 298, 52 S. Ct. 151, 76 L.Ed. 304, 306, 77 A.L.R. 1367.

"The Harrington case furnishes the correct rule." *Boyer v. Pennsylvania R. Co.,* 162 Md. 328, 337, 159 A. 909, 913.

On August 11, 1939, Congress enacted the following amendment to the Federal Employers' Liability Act:

"Any employee of a carrier, any part of whose duties as such employee shall be the furtherance of interstate or foreign commerce; or shall, in any way directly or closely and substantially, affect such commerce as above set forth shall, for the purposes of this chapter, be considered as being employed by such carrier in such commerce and shall be considered as entitled to the benefits of this chapter." 53 U.S.Stat. 1404, 45 U.S.C.A. Sec. 51.

By this Act the Congress broadened considerably the Federal Employers' Liability law. Before its passage the employee of the carrier was required to be engaged in duties involving actual transportation, or his work must have been so closely related to it as to be practically a part of it. The cases are voluminous involving the question of whether certain work performed by an employee was "practically a part of transportation". The result was that employees of carriers did not know whether they were engaged in interstate or intrastate transportation, although the great majority of traffic moving over the railroads of this country is in interstate commerce.

Under this act it is provided that the benefits of the Federal Employers' Liability Act shall apply to:

"Any employee of a carrier, any part of whose duties as such employee shall be the furtherance of interstate or foreign commerce."

"One of the purposes of the amendment of the Act as above indicated was to extend the provisions of the Federal Act to cover all employees of carriers whose work 'shall, in

any way directly or closely and substantially, affect' interstate commerce. The words used in the amendment are words often used by the Supreme Court of the United States in discussing interstate commerce and particularly in defining instrumentalities and things which may be technically in intrastate commerce but which are so related to interstate commerce that they are governed and regulated by acts of congress based upon its power to regulate interstate commerce. It would appear from the reports of the congressional committees which considered the amendment that congress intentionally used these words with the purpose of expanding the application of the act." *Piggue v. Baldwin,* 154 Kan. 708, 121 P. 2d 183, 185.

"The discussions in Congress indicate that it was the intent of the lawmakers to bring within the scope of the Federal Employers' Liability Act all employees whose work at the time of injury was not in actual interstate transportation or a part of it, but any part of whose work was in furtherance of interstate commerce, or in any way affected such commerce directly, closely and substantially." *Ermin v. Pennsylvania R. Co.,* 36 F.Supp. 936, 940.

From these authorities the test, since the 1939 Act, in determining whether the Federal act or the State law would apply, would seem to be whether at the time of the injury any part of the employee's "duties as such" was in "furtherance of interstate or foreign commerce", or did "in any way directly or closely and substantially affect such commerce". If the employee's "duties as such" was in "furtherance of interstate commerce", or did "in any way directly or closely and substantially affect such commerce", then the Federal act applies.

"The weight of authority is to the effect that the amendment should be liberally construed so as to extend the protection of this act to all employees, any part of whose duties furthers or affects interstate commerce 'in any way.' " *Agostino v. Pennsylvania R. Co.,* D.C., 50 F. Supp. 726, 729.

"Congress intended the statute to be as comprehensive in those instances in which it excludes liability as of those in which liability is imposed." *Roberts Federal Liabilities of Carriers,* Vol. 2, Second Edition, page 1535.

In *Ermin v. Pennsylvania R. Co., supra,* it was said:

"The Court should not by a strained construction override the intent of the Congress but should rather decide questions in accordance with the views expressed by the Congress. Here the Congress was trying to remedy a fault, it was enacting legislation which would not require a railroad employee to draw a hairline to determine whether or not at the moment of the accident he was actually engaged in interstate commerce. The Congress was correcting an evil which existed which prevented railroad employees from receiving a just determination of their rights."

In *Elder v. Pennsylvania R. Co.,* 118 Pa.Super. 137, 180 A. 183, page 187, decided July 18, 1935, the Court said:

"In any event the judgment cannot be sustained because the burden of proof was here on claimant to show that her decedent was, at the time, exclusively engaged in intrastate transportation. Viewing the evidence in a light most favorable to the claimant, there was no evidence that he was engaged in intrastate transportation. This principle was settled by the decision in *Philadelphia & R. Ry. Co. v. Polk,* 256 U.S. 332, 41 S.Ct. 518, 65 L.Ed. 958, which reversed the Supreme Court of Pennsylvania (266 Pa. 335, 109 A. 627). In the Polk case, the deceased employee was engaged as one of a crew handling both interstate and intrastate shipments. In reversing the state Supreme Court, it was there said (256 U.S. 332, page 335, 41 S.Ct. 518, 519, 65 L.Ed. 958): 'It would seem indisputable, therefore, if there be an assertion of the claim or remedy growing out of an occurrence in which there are constituents of interstate commerce the burden of explanation and avoidance is on him who asserts the claim or remedy, not on the railway company to which it is directed.' "

In the case of *Philadelphia & R. Ry. Co. v. Polk, supra* [256 U.S. 332, 41 S.Ct. 519, 65 L.Ed. 958], Mr. Justice McKenna said:

"We cannot accede to the view that there is a presumption that duties performed on a train constituted of interstate and intrastate commerce were performed in the latter commerce. The presumption, indeed, might be the other way. It is to be remembered that it is the declaration of the cases that if there is an *element of interstate commerce* in a traffic *or employment* (italics supplied) it determines the remedy of the employee."

And that opinion is concluded by the following:

"It would seem indisputable, therefore, if there be an assertion of the claim or remedy growing out of an occurrence in which there are constituents of interstate commerce *the burden of explanation and avoidance is on him who asserts the claim or remedy, not on the railway company to which it is directed* (italics supplied), and there is nothing in *Osborne v. Gray*, 241 U.S. 16, in opposition.

The Polk case was decided by the Supreme Court of the United States on May 16, 1921. Judge Adkins, speaking for this Court in the case of *Pennsylvania R. Co. v. Stallings*, 165 Md. 615, at page 618, 170 A. 163, at page 164, quotes from Schneider's Workmen's Compensation Law, 2nd Ed., Vol. 2, Sec. 537:

"The burden of proving that the claimant was engaged in interstate commerce at the time of the accident rests upon the employer, when he seeks to defeat a claim for compensation on this ground."

Mr. Schneider published his book in 1922. The authorities he cites to support the text are all decisions of State Courts. Among them is the opinion of the Pennsylvania Court in *Polk v. P. & R. Ry. Co.*, which was reversed by the Supreme Court of the United States. Roberts Federal Liability of Carriers, 2nd Ed., Vol. 2, Sec. 1018, states the correct rule:

"Where, however, an employee of a common carrier by railroad prosecutes an action for personal injuries and predicates a right of recovery upon the laws of a state

or the common law, and the defendant seeks to prevent a recovery under the state law by showing that the federal act applies, the general rule of evidence that the proponent of a defense must adduce the proof requisite to its establishment comes under the influence of the controlling federal rule that if in any case 'there be an assertion of a claim or remedy growing out of an occurrence in which there are constituents of interstate commerce, the burden of explanation and avoidance is on him who asserts the claim or remedy, not on the railway company to which it is directed.' This situation results from an application of the settled principle that 'if there is an element of interstate commerce in a traffic or employment it determines the remedy of the employee.' Manifestly, however, the paramount federal rule is not called into play, and has no application, unless it shall appear from the pleadings of the parties, or conformably to the rules of practice and procedure controlling the forum, from evidence adduced at the trial, that 'there is an element of interstate commerce in the traffic or employment, in connection with which the plaintiff's cause of action arose.

"Prior to the announcement by the national Supreme Court of the rule above stated, several decisions by courts of lesser authority declared a contrary rule."

When, therefore, in a case such as this, the evidence discloses that there is an element of interstate commerce involved in the claim asserted, the burden of proving that the claim arose when the party injured was engaged in intrastate commerce is upon the claimant. The statement made in *Pennsylvania R. R. v. Stallings, supra,* that "the burden of proof that the claimant was engaged in interstate commerce at the time of the accident rests upon the employer, when he seeks to defeat a claim for compensation on this ground" in the light of the ruling of the Supreme Court of the United States in *Philadelphia & R. Ry. Co. v. Polk, supra,* which is controlling, is an incorrect statement of the law. And there was evidence in the Stallings case tending to show that the duties of the deceased were in furtherance of interstate commerce.

That case was decided by this Court on January 11, 1934. The Act of Congress of 1939, supra, renders that decision on this point archaic, and it is obsolete.

From these authorities we come to the following conclusions:

1. That the present test as to whether one is engaged in interstate commerce is: Were his duties, or any part thereof, at the time of injury, in furtherance of interstate commerce or did his duties affect in any way directly or closely and substantially such commerce? If so, then the employment is in interstate commerce.

2. That the Amendment of 1939 of the Federal Act should be liberally construed to effectuate the intention of Congress.

3. In the trial of a case such as this, when the railroad offers evidence tending to show that the claimant, at the time of injury, was engaged in work, any part of which was in furtherance of interstate transportation; or in work, any part of which affects such transportation in any way, directly, or closely and substantially, then the burden of proving that the claimant, at the time of injury, was engaged entirely in intrastate transportation is upon the claimant and not upon the railroad.

4. That the Federal Act is exclusive in cases falling within its jurisdiction and bars all action to the. State Industrial Accident Commission. If the Commission attempts to take jurisdiction in such a case, its act in so doing, and all acts done in pursuance thereof by it, are null, void and of no legal effect whatever.

Turning to the record in this case. The testimony, if any, taken before the Commission, is not contained therein. In fact, no evidence at all was offered at the trial below on behalf of the claimant, affecting jurisdiction. The claim of the wife of the deceased, filed with the Commission, is set out in the record and it shows the order of the Commission awarding compensation to her. It seems to be conceded by the railroad, that the deceased was employed by it and that at the time of his injury he was engaged in the duties it employed him to perform.

At the trial of the case in the court below, the railroad offered testimony. No witnesses were produced by the claimant to contradict this testimony, and it stands uncontradicted.

William E. Albrecht, an employee of the railroad, was its head clerk at the produce terminal. He had "supervision of the records and general work in the station there", and was called to show how the traffic was handled upon its arrival at the terminal. The night before the deceased was injured there were one hundred and eight cars at the terminal, some of which were empty. He referred to four or five of these cars to illustrate how the traffic was handled. Two cars were placed in the terminal yard at 2:45 A. M. January 23, 1943. One of these cars was emptied at 3 P. M. January 26, 1943, and the other at 5 P. M. on January 25, 1943. Both of the shipments were interstate shipments. January 23, 1943, was a Saturday and no cars are unloaded on Sundays, except in exceptional instances of shipments consigned to the United States Army or Navy. None of the cars referred to by the witness were so consigned. The testimony is that these two cars which arrived at the terminal on the 23rd of January, 1943, were there on Sunday, the 24th of January, and one was unloaded on Monday and the other on Tuesday. The railroad allows the consignee forty-eight hours after 7 A. M. of the day of notification within which to unload the goods. If the goods are not unloaded within that time, a demurrage charge is assessed. Some cars are not unloaded for several days after arrival at the terminal. From this evidence, which is uncontradicted, the inference is irresistible that on Sunday, January 24, 1943, the date the deceased was injured, there were cars at this terminal containing goods in interstate traffic, which had not been delivered to the consignees. Such shipments retain their interstate character until (after notice to consignees) a reasonable time has elapsed within which to remove the goods from the cars.

In the case of *Cork v. Lehigh Valley R. Co.*, 98 N.J.L. 143, 145, 119 A. 88, 89 (a New Jersey case), the Court said:

"And it is plain, we think, that, under this statutory provision, the word 'delivery' connotes either tender to the consignee or a reasonable opportunity afforded him for the removal of the property transported. Consequently a railroad company transporting goods from one state to another is engaged in interstate commerce until delivery is made, or at least until an opportunity is afforded the consignee for the removal of the property transported, not only under the rules of the common law, but under the federal statute and an employee discharging a duty as such as that which the plaintiff was performing at the time of the accident—that is, the safeguarding of the consignment during the course of its transportation—is employed in interstate commerce."

In *Fitzgerald v. Great Northern Ry. Co.*, 157 Minn. 412, 196 N.W. 657, 658, a night watchman was killed. His "duties in and about the transfer yard required him to protect interstate and intrastate freight." "His duties were not practicably separable." "The two were so interrelated that he was not engaged at any one time in one to the conscious exclusion of the other." He was held to be employed in interstate commerce.

"The cars of coal not having been delivered to the consignee, but remaining on the tracks of the railway company in the condition in which they had been originally brought into North Carolina from points outside of that state, it follows that the interstate transportation of the property had not been completed when the corporation commission made the order complained of." *McNeill v. Southern R. Co.*, 202 U.S. 543, 26 S.Ct. 722, 725, 50 L. Ed. 1142.

In the case of *O'Brien v. Pennsylvania R. Co.*, 187 App. Div. 839, 176 N.Y.S. 390, 391, "the deceased was engaged in acting as watchman for a shipment of potatoes in barrels from the state of Florida, which had arrived at the piers", North River, New York City, and had been placed

upon what was called the "farm", "when he was run down by a motor truck and killed. The consignee was entitled to 48 hours' notice before removing the consignment. Before this time had elapsed, and before the consignee had taken possession of the shipment, or paid the freight charges thereon, the accident happened." It was held that the deceased having been engaged at the time of the accident in guarding an interstate shipment, the transportation of which had not ceased, an award could not properly be made by the State Industrial Accident Commission. The case was reversed and the claim dismissed.

Until a reasonable opportunity was given consignees to remove the goods, the duty of protecting the property in cars at this terminal arriving from points out of this state was that of the carrier and constituted an element in interstate transportation. It was the duty of the deceased to guard these cars and prevent theft of the goods therein shipped in interstate commerce. Even if some of these cars contained goods that were intrastate shipments, this would not affect the fact that part of his duties were in "furtherance of interstate commerce", on the night he was injured at this terminal. It must be inferred from the fact he was employed by the railroad to guard these cars, and that he was injured while there, that he was, at the time he was injured, engaged in duties a "part" of which was in "furtherance of interstate commerce". His case, therefore, fell under the provisions of the Federal Employers' Liability Act, and the claimant must look exclusively to the provisions of that Act for any grievance she seeks to redress. The State Industrial Accident Commission was without jurisdiction to hear and decide her case.

This case was submitted to the jury. It returned a verdict affirming the decision of the State Industrial Accident Commission. The jury refused to believe the uncontradicted testimony in the case, which, together with all reasonable inferences to be drawn therefrom, established the fact that the deceased, at the time of the acci-

dent, was engaged in duties in furtherance of interstate commerce.

As a matter of law this evidence shows conclusively that the Commission was without jurisdiction in the matter. The jury either refused to believe the evidence, although there is nothing in the testimony to warrant such disblief, or arbitrarily affirmed the award. Thus twelve laymen, with perfect impunity, override the Constitution of the United States and the law made by the Congress in conformity thereto, which is the supreme law of the land. Of course the judge below could have granted a new trial, but such action would only prolong the litigation, and if one jury is controlled by sympathy and not by the law, a second jury might be so moved, and this case would run on forever. Had the Commission refused the appellant's claim, and appeal had been prosecuted by her, there would be no question the trial court could have directed a verdict for appellee.

"In cases where the facts are conceded or undisputed, and there is no dispute as to the inferences to be drawn therefrom, their legal significance is a matter of law to be determined by the court, and if the correct legal interpretation of such undisputed or conceded facts is in conflict with the finding of the commission, its findings must give way, notwithstanding the provision of the statute that the award of the commission shall be 'prima facie correct and the burden of proof shall be upon the party attacking the same.' * * * Because if the facts are conceded or undisputed, there is no issue of fact to be submitted to the jury, and the question as to whether the finding of the commission was correct necessarily becomes one of law for the court to decide." *Bogatsky v. Swerdlin,* 152 Md. 18, 21, 135 A. 416, 417; *Beyer v. Decker,* 159 Md. 289, 291, 150 A. 804; *Gunter v. Sharpe & Dohme,* 159 Md. 438, 445, 151 A. 134.

It is true that appellant did not concede that the Commission was without jurisdiction to hear her claim and naturally she did not raise the question; but the uncontradicted evidence in the case established the fact that the Commission was without jurisdiction in the matter.

436

We hold, when on an appeal from an award of the State Industrial Accident Commission, the uncontradicted evidence, and all reasonable inference to be drawn therefrom, establishes the fact that the Commission was without jurisdiction to hear a claim, that a question of law is presented, and the trial judge should, upon application by the plaintiff, instruct the jury to reverse the finding of the Commission.

*Judgment affirmed, with costs to appellee.*