PANSY G. FUTRELLE, ADMINISTRATRIX OF THE ESTATE OF EGBERT A. FUTRELLE, v. ATLANTIC COAST LINE RAILROAD COMPANY.

(Filed 21 November, 1956.)

**1. Master and Servant § 25c—**

In order to be subject to the Federal Employers' Liability Act, an employee need not be at the precise moment of the injury engaged in interstate rather than intrastate commerce, and where the conductor on a run starts with cars destined for interstate as well as for intrastate commerce, the fact that at the time of his injury his train was composed solely of cars for intrastate shipment does not preclude the application of the Federal Act.

**2. Master and Servant § 28—**

Nonsuit for contributory negligence of the employee is not permissible under the Federal Employers' Liability Act, since under the Act contribu-

tory negligence does not bar recovery, but is to be considered only in diminution of damages.

**3. Master and Servant § 26—Evidence held insufficient to show negligence of railroad employer in action under Federal Employers' Liability Act.**

Evidence tending to show that defendant's engine was pushing freight cars in switching operations, so that its headlight and oscillating light were obstructed by a boxcar immediately in front of the engine, is insufficient to be submitted to the jury on the question of negligence of the carrier in causing the death of the conductor of the train, presumably hit by the front freight car in the course of his duties relating to the switching operation, when the evidence further shows that the place where the conductor was killed was in a well lighted area, that he was standing on the opposite side of the train from the side on which he knew the signals with respect to the movement of the train would be made, and that the switching operations were being performed in the usual and customary manner theretofore followed in this particular yard and in accordance with the express instructions given to the crew by the conductor.

JOHNSON, J., not sitting.

APPEAL by plaintiff from *Stevens, J.,* April Term, 1956, of NEW HANOVER.

This is a civil action instituted on 9 November 1951, pursuant to the provisions of the Federal Employers' Liability Act, to recover for the alleged wrongful death of Egbert A. Futrelle on 21 November 1950. Pansy G. Futrelle, his childless wife and sole dependent relation, is the duly qualified and acting administratrix of his estate.

Plaintiff's intestate had been an employee of the defendant for 39 years. He had been a conductor for 24 years prior to his death at approximately 12:07 a.m. on 21 November 1950. He was 61 years of age.

On 20 November 1950, conductor Futrelle and his regular crew, consisting of V. C. McIntyre, engineer, J. P. Tucker, Jr., brakeman, R. N. Walters, flagman, and R. H. Perkins, fireman, left Sanford, North Carolina, about 6:00 p.m. with defendant's train No. 228 for Fayetteville and Wilmington, North Carolina. In the train as originally constituted in Sanford there were five cars which were destined for movement outside of the State of North Carolina. All of these cars were set out of the train at Fayetteville or between Sanford and Fayetteville. None of the cars in the train which left Fayetteville, or which were in the train at the time of the death of plaintiff's intestate or which were in the train when it arrived in Wilmington, were destined for movement outside of the State of North Carolina.

The scene of conductor Futrelle's death was within the yards of the Becker County Sand and Gravel Company, hereinafter called Becker. These yards are located about four miles west of Vander, North Caro-

lina, on the Becker lead which turns off of the main line at Vander, which is about ten miles south of Fayetteville. There is a pass track about one mile east of the approximate center of the Becker yards and is approximately 1,000 feet northeast of Highway No. 53. It is about 1,000 feet from the loading chute in the Becker yards to the dead end of the track on what is referred to in the evidence as the "hill." The elevation of the track where it ends on the "hill" is some 15 feet higher than it is at the loading chute.

On the night in question the train was left on the Becker lead between the Vander turn-off and the pass track. The entire crew went to the Becker yards with just the engine. A boxcar was picked up at the concrete house and coupling made to the loaded gondola cars on the loading or western track. The shipping instructions were picked up from the Becker office by conductor Futrelle and flagman Walters, and the cars marked "East" or "West." Conductor Futrelle then instructed flagman Walters and brakeman Tucker to take the loaded cars out to the pass track, bring back the empties there and couple them with 12 other empty cars standing on the by-pass or eastern track; and according to the testimony of J. P. Tucker, Jr., conductor Futrelle said "he would walk back up on the hill where we spot the cars, and line up the switches and check the cars, and would be there when we came back. We have to give the initials and numbers of all the cars in the plant for the dispatcher and the agent each night." Likewise, flagman Walters testified that conductor Futrelle told him he would be on the "hill"; and told him to complete the coupling of the empties with the other 12 cars. The crew took the loaded cars out to the pass track and left conductor Futrelle to go up on the "hill," which was the last time any of the crew saw him alive. The crew then coupled the engine to 27 cars (the concrete boxcar, another car, and 25 empty cars) and started back into the Becker yards. The engine was pushing in a forward direction. The engine headlight and the oscillating light were burning. Signals were blown at the highway crossings. Flagman Walters was standing inside the front end of a gondola car, which was the leading car, away from the engine, and was giving his signals with a fusee. He was making the movement and was the lookout. Brakeman Tucker was riding on a hopper or gondola car about midway the cut of 27 cars.

Engineer McIntyre and fireman Perkins were in the engine cab. Signals were relayed by light from the flagman through the brakeman to the fireman on the left side of the engine, who relayed the signals to the engineer on the right side of the engine. Signals were of necessity passed on the left or fireman's side because the track made a rather sharp turn to the left. Conductor Futrelle was familiar with the yard and knew that the signals had to be made from the fireman's side.

Flagman Walters signaled for a stop and the train stopped 15 to 20 feet short of the 12 empty cars. Flagman Walters signaled for a forward movement and the coupling was made. After the coupling was made the only movement made by the 12 cars was the slack running out and in of the 12 cars, which would be about six feet in the 12 cars. Flagman Walters then began checking the couplings and air hoses on the 12 cars towards the south. After checking ten couplings, when he got between the tenth and eleventh cars, from the one to which the train had coupled (second and third from the south end), he found the body of conductor Futrelle. The body was lying on the rail on the engineer's side, the opposite side of the track from where the signals were passed. This point was approximately 40 feet north of the loading chute and was well lighted from the lights on the chute and the ground was level with no holes or obstructions. The conductor's lantern was lying at his feet between the rails and under the couplings of the car and was still burning.

At the close of the plaintiff's evidence the defendant moved for judgment as of nonsuit which was allowed, and the plaintiff appeals, assigning error.

*Aaron Goldberg and George Rountree, Jr., for appellant.*
*Poisson, Campbell & Marshall and L. J. Poisson, Jr., for appellee.*

Denny, J. We do not understand that in order for an employee of a railroad to be entitled to the benefits of the Federal Employers' Liability Act such employee at the precise moment of the injury must have been engaged in interstate rather than in intrastate commerce. U.S.C.A. 45, section 51, as amended in 1939; *Robinson v. Pennsylvania R. Co.,* 214 F. 2d 798; *Agostino v. Pennsylvania R. Co.,* D.C.N.Y. 1943, 50 F. Supp. 726; *Albright v. Pennsylvania R. Co.,* 183 Md. 421, 37 A. 2d 870, *certiorari* denied 323 U.S. 735, 89 L. Ed. 589; *Scarborough v. Pennsylvania R. Co.,* 154 Pa. Super. 129, 35 A. 2d 603.

The 1939 amendment to section 51 of U.S.C.A. 45 added the following paragraph: "Any employee of a carrier, any part of whose duties as such employee shall be the furtherance of interstate or foreign commerce; or shall, in any way directly or closely and substantially, affect such commerce as above set forth shall, for the purposes of this chapter, be considered as being employed by such carrier in such commerce and shall be considered as entitled to the benefits of this chapter."

In *Robinson v. Pennsylvania R. Co., supra,* the Court held that a railroad carpenter who was injured while repairing a highway bridge over the defendant's railroad which carried interstate rail movements, the employee's work so directly or closely and substantially affected interstate commerce as to bring him within the coverage of the Federal

Employers' Liability Act, although the bridge was intrastate in character.

In the case of *Albright v. Pennsylvania R. Co., supra,* Clayton L. Albright was employed by the railroad as a special policeman whose duty it was to guard and examine cars in the yard of its terminal in Baltimore and to ascertain whether the seals had been broken on the cars. If he found a seal broken, it was his duty to apply another seal to the car in order to safeguard the lading, and generally to see that no theft was committed. While engaged in guarding interstate as well as intrastate shipments, he sustained an injury that resulted in his death. The Court held that under the provisions of the 1939 amendment to section 51 of the U.S.C.A. 45, the right to recover for his injury and death was limited to the Federal Employers' Liability Act.

The evidence on the present record shows that between Sanford and Fayetteville on this particular run, conductor Futrelle and his crew had handled five cars destined for interstate movement. Consequently, we hold that part of the duties of conductor Futrelle required him to engage in the furtherance of interstate commerce, and whatever rights his personal representative may have, if any, against the defendant railroad are subject to the provisions of the Federal Employers' Liability Act.

In determining whether or not the court below committed error in granting the defendant's motion for judgment as of nonsuit, we are not concerned with the question of contributory negligence. Under the provisions of the Federal Employers' Liability Act, U.S.C.A. 45, section 53, contributory negligence is not a bar to recovery, but, in the event of a recovery, the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employee. *Graham v. Atlantic Coast Line R. Co.,* 240 N.C. 338, 82 S.E. 2d 346; *Cobia v. Atlantic Coast Line R. Co.,* 188 N.C. 487, 125 S.E. 18; *Davis v. Southern R. Co.,* 175 N.C. 648, 96 S.E. 41.

Therefore, the sole question before us is whether or not the plaintiff's evidence is sufficient to go to the jury on the question of actionable negligence on the part of the defendant. *Wilkerson v. McCarthy,* 336 U.S. 53, 93 L. Ed. 497; *Eckenrode v. Pennsylvania R. Co.,* C.C.A. Pa. 1947, 164 F. 2d 996, affirmed 335 U.S. 329, 93 L. Ed. 41.

The plaintiff argues and contends that in pushing 27 cars towards the 12 standing empties to which the train was to be coupled, with a cement box car immediately in front of the engine, obscuring the headlights, was in conflict with I.C.C. Rule 231 (a) through (f), especially section (e) thereof, and, without regard to any other acts of negligence, is sufficient to take the case to the jury, citing *Tiller v. Atlantic Coast Line R. Co.,* 323 U.S. 574, 89 L. Ed. 465.

Section (e) of I.C.C. Rule 231 reads as follows: "Each locomotive used in yard service between sunset and sunrise shall have two lights, one located on the front of the locomotive and one on the rear, each of which shall enable a person in the cab of the locomotive under the conditions, including visual capacity, set forth in section (a), to see a dark object such as there described (as large as a man of average size standing erect) for a distance of at least 300 feet ahead and in front of such headlight; and such headlights must be maintained in good condition."

In the last cited case, the defendant had failed to have a light attached to the rear of its engine (in which direction it was being operated at the time of the accident), as required by the rules, and the Court said: "The deceased met his death on a dark night, and the diffused rays of a strong headlight even though directly obscured from the front, might easily have spread themselves so that one standing within three car-lengths of the approaching locomotive would have been given warning of its presence, or at least so the jury might have found. The backward movement of the cars on a dark night in an unlit yard was potentially perilous to those compelled to work in the yard."

In the present case the headlight was on, and an oscillating light. Moreover, the movement of the train was being made in accord with the express instructions of the plaintiff's intestate and at a time when he had said he would be up on the "hill." The place where conductor Futrelle was killed was some 40 feet north of the loading chute, in a well lighted area, on the opposite side of the train from where he knew the signals with respect to the movement of the train would be given. The cars which conductor Futrelle said he was going to check and where he would be when his crew came back to couple with the 12 empty cars on the by-pass track, were located near the south end of the track which was approximately 1,000 feet south of the loading chute.

The plaintiff's evidence, in our opinion, supports the view that the members of the train crew of the defendant at the time of the death of plaintiff's intestate were performing their duties in the usual and customary manner theretofore followed in the Becker yard and according to the express instructions given to them by conductor Futrelle. Hence, we hold that the evidence is insufficient to establish actionable negligence on the part of the defendant.

The ruling of the court below is
Affirmed.

JOHNSON, J., not sitting.