BALTIMORE & OHIO RAILROAD COMPANY *v.*
RODEHEAVER, Administrator
[No. 142, October Term, 1950.]

*Decided May 17, 1951.*

The cause was argued before MARBURY, C. J., and DELAPLAINE, COLLINS, GRASON, HENDERSON and MARKELL, JJ.

*E. Stuart Bushong* and *Irvine H. Rutledge,* with whom were *William R. Offutt* and *Lane, Bushong & Byron* on the brief, for the appellant.

*Walter W. Dawson* and *Neil C. Fraley* for the appellee.

COLLINS, J., delivered the opinion of the Court.

This is an appeal from a judgment rendered in favor of the appellee for the death of Delpha H. Rodeheaver, killed when run over by appellant's train in Oakland, Maryland. The suit was brought under the Federal Employers' Liability Act, (the Act), it being alleged that he was engaged in interstate commerce at the time of the accident.

In September, 1948, the State Roads Commission of Maryland, (Commission), began repairs on the Oak Street bridge in Oakland, Maryland, and employed the firm of Lattimore Construction Company to do the work. In order to make these repairs it was necessary to suspend scaffolding under the bridge over the appellant's tracks with a clearance of only a few feet above the trains. Double tracks of the main line of the appellant ran east and west through the town of Oakland and under this bridge. About one block west of the bridge there was a grade crossing at Oak Street. There was a sharp left curve in the tracks between this grade crossing and the bridge. When trains passed under the scaffolding they created quite a danger for the men working thereon. Unless they removed themselves in ample time, hot steam, smoke and cinders from appellant's engine would inflict serious injury. In order to safeguard these employees the Commission requested the appellant to put a watchman there. The appellant posted bulletins advertising for a man qualified to do this work. Mr. Morrison, the superintendent of the Cumberland division for the

appellant said: "The man that had the proper knowledge of what would go on on the railroad; these bulletins were posted and the senior applicant was assigned, and Mr. Rodeheaver was the second applicant and was assigned to do this work." He was paid his wages by the appellant, he having had 28 years experience on the railroad. The Commission, however, reimbursed the appellant for the wages he received while on this job. It is admitted by the appellant that Rodeheaver was its employee. Ordinarily the appellant ran its westbound trains on the northerly or No. 1 track and its eastbound trains on its southerly or No. 2 track. The employees of the railroad were instructed in part, however, as follows: "They must expect trains to run at any time on any track in either direction. They must not stand on the track in front of an approaching engine or car for the purpose of boarding same. They will exercise care to avoid danger from approaching trains standing clear of all running tracks."

On October 20, 1948, Train No. 96, a loaded 67 car freight train, left Terra Alta, West Virginia, at 3:43 P.M. to travel through Oakland. The trainmen on that train had received a special order to "look out for scaffolding suspended under bridge 87-B, concrete overhead bridge at Oakland, Maryland, which will not clear man on car. Between 7:30 A.M. and 4:00 P.M., daily, except Sunday, sound whistle as warning to men working on scaffolding and reduce smoke as much as possible." Train No. 96 was shifted from the eastbound track to the westbound track at Terra Alta to allow the Cincinnatian also eastbound, to use the eastbound track. No. 96 traveling east struck and killed the decedent, Rodeheaver, who was walking east on Track No. 1, with his back to the train about 80 feet east of the Oak Street Bridge. No. 1 Track was the usual westbound track.

Appellant claims that the decedent was engaged in intrastate and not interstate commerce at the time of his death and therefore that his case does not come under the Federal Employers' Liability Act. Prior to the

1939 Amendment to the Federal Employers' Liability Act, the test was whether the work was "in interstate transportation or work so closely related thereto as to be practically a part of it". The 1939 amendment, 53 U. S. Stat. 1404, 45 U. S. C. A. Sec. 51, however provides: "Any employee of a carrier, any part of whose duties as such employee shall be the furtherance of interstate or foreign commerce; or shall, in any way directly or closely and substantially, affect such commerce as above set forth shall, for the purposes of this chapter, be considered as being employed by such carrier in such commerce and shall be considered as being employed by such carrier in such commerce and shall be considered as entitled to the benefits of this chapter." Cases relied on by the appellant prior to the 1939 Amendment are not helpful here. Appellant relies on the case of *Holl v. Southern Pacific*, D. C., 71 Fed. Supp. 21 (1947). In that case a clerk in a claim department of a railroad had the duty only of writing on a form the route over which freight, on which a claim for loss or damage had been made, had traveled. The court in that case held that she was not engaged in the furtherance of interstate commerce. That case on the facts seems hardly similar to the one before this Court. Mr. Morrison, the superintendent for appellant said: "The State was doing the work on the Oak Street Bridge with a contractor, who was working for the State on this contract with the State; and when men are working under a bridge like that or on a bridge, the blast of a locomotive when he is working the throttle throws cinders out of there, and they just cut like buckshot; and if a man is under the bridge and got caught in that blast, it is liable to cause him injury and therefore we put men or the contractors, the State in this case, put a man there to warn the employees on the bridge to get in the clear when trains approached; *also these employees may have been down on the tracks or crossing the tracks,* to get clear of the tracks when the trains are approaching." He also said that at one time he rode past on the train, and he got his "highball"

from Rodeheaver. Mr. Theis, the train master for the appellant, said he gave the deceased no other orders "than to tell him he was sent up to protect the men while working on the bridge". On the other hand, Mr. King, the foreman for Lattimore Construction Company said he observed the deceased many times and was familiar with his duties as flagman at the bridge. He said his custom "to give a clear sign was to give a highball to the locomotive, and the engineer gave a highball back" which was "two short blasts of the whistle". Mr. King said: "He would wave his hand with a piece of white paper in his hand and in return he would get a signal from the locomotive." He said the deceased did this "with all trains going both directions while this job was being done", except with the train that killed him.

In *Albright v. Pa. R. R. Co.*, 183 Md. 421, 431, 37 A. 2d 870, this Court held that this 1939 Amendment should be liberally construed to effectuate the intention of Congress. There was evidence that it was the duty and custom of the deceased, not only to warn the men working on the bridge, but to prevent appellant from injuring them; also to warn any of their men "down on the tracks or crossing the tracks", and also the crews of the trains of his admitted employer, the appellant. As pointed out in *Chicago M. St. P. & P. R. Co. v. Kane*, 9 Cir., 33 Fed. 2d 866, whether an employee is engaged in interstate commerce within the Act depends on the facts of each particular case. It certainly could not be judicially declared in the instant case that no part of Rodeheaver's duties as an employee was in the furtherance of interstate commerce or that his duties did not in some way directly or closely and substantially affect interstate commerce. Even before the 1939 Amendment it had been held that a crossing watchman in the employ of a railroad which operates in interstate commerce, whose duty it was, among other things, to prevent injury from trains, was engaged in interstate commerce under the Act. *Southern Pacific Co. v. Commission*, 174 Cal. 16, 161 Pac. 1142.

In *West v. Atlantic Coast Line R. R. Co.*, 174 N. C. 125, 93 S. E. 479, (1917), a watchman at a railroad crossing, whose duties were to warn persons traveling across the crossing and give signals to interstate trains at the time of the accident, was held to be engaged in interstate commerce and governed by the Federal Employer's Liability Act.

Federal Court cases since the 1939 Amendment seem to refute appellant's contention. A repairman injured while making installations in coal cars was engaged in the furtherance of interstate commerce within the meaning of the Act. There the employer did not press the argument that the employee was engaged in intrastate commerce. *Skidmore v. Balto. & Ohio R. R. Co.*, 2 Cir., 1948, 167 Fed. 2d 54. A tinsmith employed in the railroad repair shops, the facilities of which were used in interstate commerce, was within the Act, even though he had received a workmen's compensation award. *Bretsky v. Lehigh Valley R. R. Co.*, 2 Cir., 1946, 156 Fed. 2d 594. An employee operating a crane used in repairing freight cars, which were employed in both intrastate and interstate commerce, was within the Act. *Shelton v. Thompson*, 7 Cir., 1945, 148 Fed. 2d 1. A mechanic's helper injured while repairing the stoker of a locomotive which had been used in interstate commerce, and which was intended for further use therein, was within the Act. *Edwards v. Balto. & Ohio R. R. Co.*, 7 Cir., 1942, 131 Fed. 2d 366. A brakeman engaged in the moving of "dead" engines to a repairshop, which engines had been employed before and were to be employed afterwards in interstate commerce, was within the Act. *Ermin v. Penn R. R. Co.*, D. C., 36 Fed. Supp. 936. State cases also seem to support the appellee here. A boiler-maker engaged in intrastate commerce five days a week but who worked in interstate commerce the sixth day was held within the Act. *Wright v. New York Central R. R. Co.*, 1942, 263 App. Div. 461, 33 N. Y. S. 2d 531. An employee working in the "back shops" of a railroad on disabled and "dead" engines, some of which are used

in interstate commerce, was held within the Act. *Baird v. N. Y. Central R. R. Co.*, 299 N. Y. 213, 86 N. E. 2d 567 (1949). See also *Lewis v. Industrial Accident Comm.*, 1942, 19 Cal. 2d 284, 120 Pac. 2d 886; *Prader v. Penn. R. R. Co.*, 1943, 113 Ind. App. 518, 49 N. E. 2d 387; *Avance v. Thompson*, 1944, 387 Ill. 77, 55 N. E. 2d 57, reversing 320 Ill. App. 406, 51 N. E. 2d 334; *Moser v. Union Pac. R. Co.*, 1944, 65 Idaho 479, 147 P. 2d 336, 153 A. L. R. 341; *Harris v. Missouri Pac. R. Co.*, 1944, 158 Kan. 679, 149 P. 2d 342; *Great Northern R. Co. v. Industrial Commission*, 1944, 245 Wis. 375, 14 N. W. 2d 152; *Trucco v. Erie R. R. Co.*, 1946, 353 Pa. 320, 45 A. 2d 20; *Maxie v. Gulf M. & O. R. R.*, 1947, 356 Mo. 633, 202 S. W. 2d 904; *Atlantic Coast Line R. R. v. Meeks*, 1947, 30 Tenn. App. 520, 208 S. W. 2d 355; *Hallaway v. Thompson*, Tex. Civ. App. 1950, 226 S. W. 2d 816; *Pritt v. West Va. Northern R. Co.*, W. Va. 1948, 51 S. E. 2d 105, 6 A. L. R. 2d 562, certiorari denied 336 U. S. 961, 69 S. Ct. 891, 93 L. Ed. 1113; *St. Louis-San Francisco Ry. Co. v. Wacaster*, 1947, 210 Ark. 1080, 199 S. W. 2d 948.

In its fourth prayer the appellant asked the court to instruct the jury "that if they find from the evidence that the engineer of the Railroad Company had sounded his whistle in due time to warn the deceased, Delpha H. Rodeheaver, of the approach of the train, that there was no duty on the part of the Railroad also to inform the deceased that the train was not being operated on the usual or accustomed track." Appellant claims that this prayer should have been granted because the failure to warn decedent of the eastbound train on westbound track was not evidence of negligence or a proximate cause of the accident. There was evidence that except for the usual warning at a crossing, 800 yards west of the bridge, no warning was given. As hereinbefore recited, the train at the time of this accident, was proceeding east on the track usually used for trains bound in a westerly direction. Appellant's superintendent testified that it was not only the duty of the deceased to warn the em-

ployees on the bridge but also those employees who may have been down on the tracks or crossing the tracks. There was also evidence that it was the custom of the deceased to give a clear sign to the trains as they passed under the bridge and that this was done with all trains going either easterly or westerly. The train crew was also issued orders to sound the whistle as a warning. It is therefore clear that the railroad knew or should have known that this employee, as a watchman, was on the tracks. There was testimony that the order from the division superintendent called for a watchman under the bridge. It is admitted by the appellant in its brief that a number of cases hold under the Act "that where a train is run on the opposite track (i.e. the track usually used for trains bound in the opposite direction) and the railroad has reason to expect employees to be on the track, such as repairmen, it was the duty to either (a) warn them of the change in track or (b) give proper warning and proceed with caution." As authority it cites: *Louisville & N. R. Co., v. Asher's Administrator*, 1917, 178 Ky. 67, 198 S. W. 548, L. R. A. 1918B, 211; *Smith v. Delaware & H. Co.*, 1929, 227 App. Div. 269, 237 N. Y. S. 297; *DeLillis v. Pittsburgh & Lake Erie Ry. Co.*, 1944, 350 Pa. 436, 39 A. 2d 588; *So. Ry. Co. v. Mc-Guin*, 4 Circ., 1917, 240 F. 649; *Louisville & N. R. Co. v. Parker*, 223 Ala. 626, 138 So. 231. In *Balto. & Ohio R. R. Co. v. Logsdon*, 101 Md. 359, 61 A. 189, a train was backed westward on an eastbound track and the track walker was run over and killed. The defendants' evidence was that there was a light on the end of the tender as it ran back, that the whistle was sounded from time to time and the bell constantly rung and that the engine driver did not see the deceased before he was struck. However, one of plaintiff's witnesses said that after the accident there was no light on the tender. There was no evidence to explain why the deceased did not see or hear the engine or to show that the accident was caused by the absence of the light. This Court there held that the evidence was not legally sufficient to

show that there was any negligence on the part of the railroad company. However, it was said in that case at page 363: "It must be conceded that although it is not negligence to use under such circumstances a track for an engine going in an opposite direction from that for which the track is primarily intended, it is the duty of the agents in charge of such engine to adopt all reasonable precautions to avoid injuring those who have the right to be, or may be, on the track." In this case, as there is evidence that the employees of the railroad company should have known that the watchman was on the tracks, the trial court was correct in refusing this fourth prayer. *Louisville & N. R. Co. v. Simpson's Adm'r*, 64 S. W. 750, 23 Ky. Law. Rep. 1075; *Concannon v. Davis*, 123 Me. 450, 123 A. 820; *Pittsburgh, C. C. & St. L. Ry. Co. v. Bennett*, 186 Ind. 672, 116 N. E. 582; *Kurn v. Weaver*, 25 Tenn. App. 556, 161 S. W. 2d 1005. Compare, however, *Amoroso v. B. & O. R. R. Co.*, 305 Pa. 195, 157 A. 463. Cases in which engines have been backed up without warning seem to hold that the employer is liable under the Act. *Pacheco v. New York, N. H. & H. R. Co.*, 2 Cir., 15 F. 2d 467; *Messinger v. New York, N. H. & H. R. Co.*, 85 Conn. 467, 83 A. 631; *Cervona v. Delaware L. & W. R. Co.*, 95 N. J. L. 246, 114 A. 14; *Louisville & N. R. Co. v. Schroader*, Ky., 113 S. W. 874; *Hudson v. Seaboard Air Line*, 176 N. C. 488, 97 S. E. 388. Compare, however, *D'Aurio v. Long Island R. R. Co.*, 240 N. Y. 241, 148 N. E. 333.

During the trial, the appellant made the following proffer: "That the overhead bridge in Oakland, the repair and construction of and maintenance of it is entirely with the State of Maryland and the Baltimore and Ohio Railroad Company has no responsibility in any manner for the maintenance of the same, and under the agreement with the State Roads Commission was to save it harmless from all loss, cost, damage, or expense or claims therefor for injury to persons or damage to property in any manner due to or connected with or growing out of the erection of said bridge or its main-

tenance or operation thereafter." The contract between the appellant and the State Roads Commission was then offered in evidence to sustain this proffer and was refused by the court. We think this refusal was proper because this case is not concerned in any way with whether the Commission should indemnify the appellant for any damage it might sustain as a result of this accident. The appellant also claims that this contract was offered to prove that the deceased at the time of the accident was guarding employees of the State or its contractors, not employees of the defendant. We see nothing in the contract to sustain this contention.

The appellant's "D" prayer asked the court to instruct the jury "that from all the evidence in this case the proximate cause of the injuries of the plaintiff's decedent was his negligence in stepping upon the westbound track without first looking to the west and, therefore, the verdict of the jury must be for the defendant." This prayer was refused and the appellant here claims that the trial judge should have ruled that the appellant's own negligence was the proximate cause of the accident. There was testimony that the whistle was sounded near the depot, 800 yards west of the bridge, but that the danger signal was not given as the engine approached the bridge. Mr. Hayden, the crossing watchman for the appellant, testified that from the signal light in his shanty he knew that the train was on No. 1 track. He saw Mr. Rodeheaver up under the bridge or just a little east of the bridge. He walked out and pointed to No. 1 track and pointed west. "The men had their scaffold on a cable and he was hollering to them. Of course, they had an air compressor going and I couldn't hear what they were saying and they kept pulling back clear of No. 1 track and, of course, I thought he had got my signal, that the train was coming on No. 1 track * * * I had some school children, was around the crossing, and I was watching them pretty close, and I never looked around until after the train had crossed the crossing, and I looked up under the bridge and it looked like

about thirty or forty feet under the bridge, Rodeheaver stepped with his left foot up over the rail and had a piece of paper and had this piece of paper in his right hand, giving them a highball and looking east." Mr. DeWitt, an employee of the Lattimore Construction Company, working on the bridge, said that when he heard the train coming, Mr. Rodeheaver had just come up the track and "warned us to get off the eastbound track and then the watchman at the crossing signaled that there was a train coming on the other track". He said that the watchman at the crossing "when I seen him, he was pointing to the track on the side he was on, on No. 1 track, he was pointing on it." Mr. Rodeheaver was then out in the middle of the tracks. "He warned the men to get off of the eastbound track, a train coming; then after I think he seen the watchman motioning to him, I am pretty sure he did, I got the impression there was another train coming west; so he hollered at us— there was men on both sides of the track overhead; and when he motioned for the eastbound track to clear over on that side; and after the watchman had seen that there was a train coming on the east track, he hollered and said to clear the westbound track, that there was a train coming westbound." He said Mr. Rodeheaver was walking east at the time he hollered, was still in the middle of the tracks "he turned around to highball the train that he thought was coming west and started to walk east on the westbound track." At that time the deceased with his back to the train was struck and killed. Of Course, under the Federal Employers' Liability Act contributory negligence is not a bar to recovery. By Section 53 of that Act "* * * contributory negligence shall not bar a recovery, but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employee * * *". The jury was instructed as to this in appellant's first prayer. Appellant relies on the case of *Reynolds v. Atlantic Coast Line,* 1949, 336 U. S. 207, 69 S. Ct. 507, 508, 93 L. Ed. 618, in which the Supreme Court sustained

a finding of the Alabama Supreme Court, Justices Black, Douglas, Murphy and Rutledge dissenting. There the duties of the deceased brakeman required him to cross between cars on moving freight trains. The accident happened while the deceased was crossing, as part of a required journey, from the caboose to a car from which a signal was to be given. The Supreme Court there said "The signal ordinarily would have been given from the sixth car from the caboose. The complaint charged, however, that because the railroad had negligently allowed canes to grow alongside the roadbed the deceased could not safely signal from the six car and so had to cross to the seventh in order to give the required signal. On this additional crossing he was killed. The complaint also charged that the deceased would not have had to make this particular journel at all if the railroad had provided a competent assistant brakeman. Neither the journey nor the crossing on which the accident occurred was alleged to be any more hazardous than that usually undertaken by railroad brakemen." The Alabama Supreme Court held, under the Federal Employers' Liability Act, that the facts alleged did not show that the accident resulted proximately, in whole or in part, from the negligence of the defendant. In the instant case the running of the eastbound train on the usual westbound track was, of course, an unusual occurrence and a hazard to which the deceased was not usually subjected. Appellant also relies on *Moore v. Chesapeake & O. R. Co.,* 1951, 340 U. S. 573, 71 S. Ct. 428, 429. In that case a brakeman fell from the footboard of an engine tender. The only eyewitness was the engineer, who testified that he did not stop the train until he saw the brakeman fall. Suit was brought under the Act on the theory that the engineer made a sudden and unexpected stop without warning, "thereby causing decedent to be thrown from a position of safety on the rear of the tender". The Supreme Court held in that case, Justices Black and Douglas dissenting, that as the engineer was the only eyewitness and all the evidence showed that the deceased

fell before the train stopped, and as speculation could not supply the place of proof that a directed verdict for the defendant was properly granted. That case is not helpful here.

In *Tiller v. Atlantic Coast Line R. Co.*, 318 U. S. 54, 63 S. Ct. 444, 87 L. Ed. 610, an employee was between two tracks, with his back to one, and a train proceeded down the track behind him, after ringing its bell. The Supreme Court there held that the question of negligence was for the jury, even though a company rule advised employees that they must watch out for themselves, since no employee was assigned to do so. The Court's decision is predicated mainly upon the fact that assumption of risk is no defense to the railroad under the Act, and upon the fact that the employee was given no special warning, other than the ringing of the bell. In *Keeton v. Thompson*, 326 U. S. 689, 66 S. Ct. 135, 90 L. Ed. 405, reported below at 183 S. W. 2d 505, a conductor fell from the car while a coupling was being made. Everyone else on the train testified that the jolt was an ordinary one, accompanied only by a slight jar. The coupling was described as "very light and easy". Two men stationed in the cab testified that they felt no jolt or jar, and there was evidently no other complaint. It was held that a question for the jury was presented. In *Lavender v. Kurn*, 327 U. S. 645, 66 S. Ct. 740, 90 L. Ed. 916, brought under the Act, the body of an employee was found sometime after the accident. There were no direct witnesses to the tragedy. Plaintiff surmised that he had been struck by a mail hook hanging out from the train, although he would have had to be standing on a mound of earth to have been struck by the hook and although the position of his body was such that if he had fallen instantly he could not have been standing in such a position. The Court, in allowing the case to go to the jury, said that he might have wandered in a daze after being struck. There was no other evidence that he had been standing on a mound. In *Lillie v. Thompson*, 332 U. S. 459, 68 S. Ct. 140, 141, 90 L. Ed.

73, brought under the Act, plaintiff, a young woman, worked throughout the night in a shack in defendant's railroad yards, admitting employees of the railroad from time to time for business purposes. A stranger gained admittance and struck plaintiff one night. The Court there held that it was for the jury to decide whether plaintiff was injured through defendant's negligence in failing to light or guard the premises, since defendant "had reason to know the yards were frequented by dangerous characters". In *Penn v. Chicago & N. W. Ry. Co.*, 335 U. S. 849, 69 S. Ct. 79, 93 L. Ed. 398, reported below at 163 Fed. 2d 995, plaintiff, from an unusual and awkward position, attempted to release a car several times with an automatic coupler. His position, of course, was not a correct one. Then twice while running alongside the train he tried again, succeeding the second time. The negligence complained of was the railroad's violation of the Federal Safety Appliance Act, which requires the railroads to use couplers in the operation of which men need not go between the cars. It was held that the case should have been submitted to the jury. Defendant's "D" prayer was properly refused.

The appellant in its twelfth prayer asked the court to instruct the jury "that the evidence in this case establishes that the deceased knew that a train was approaching from the west in time to have removed himself from a place of danger, and that therefore any failure on the part of the defendant to sound a warning whistle was not a proximate cause of the accident." This prayer was properly refused because there is not the slightest evidence in the case to show that the deceased knew that the eastbound train was proceeding on the westbound track. Also, as hereinbefore decided, under the discussion of appellant's fourth prayer, the jury could have found that the failure of the appellant to sound a warning whistle was the proximate cause of the accident.

In its third prayer the appellant asked the court to instruct the jury "that the speed of the railroad train

is not evidence of negligence on the part of the defendant, the Baltimore and Ohio Railroad," and in its ninth prayer that the jury be instructed "that the speed of the defendant's train was not a proximate cause of the accident complained of in this case." The appellant assigns as error the failure of the trial court to grant these two prayers. On this left curve the engineer could not see the track. Mr. King, the construction superintendent for the Lattimore Construction Company, testified that he asked Mr. Theis, the train master for the appellant, on two or three occasions, if he could get a little more consideration on the speeds of the train and the smoke and "if they would shut their throttles off while going under the bridge due to the fact that the cinders and smoke were choking our men up and they couldn't work under a handicap like that." The engineer of the train, Raymond Smith, testified that as he approached the Oak Street bridge he reached up and shut the throttle off because he had instructions to do this. This was necessary because with the throttle open "you form an artificial vacuum through your fire box and from your exhausts of steam from your cylinders and it makes an artificial vacuum when it comes through and it makes a heavy blast out of the stack." As he went under the bridge he closed the throttle and it caused a down draught of smoke and steam to come down around the engine and around the cab. With this steam around the cab none of the persons on the engine saw Mr. Rodeheaver at all and did not know that he was killed until they reached Mountain Lake and found a cap on the pilot and pieces of flesh back over the left side of the engine. Mr. King testified that at the time of the accident the train was traveling 40 miles an hour. Mr. DeWitt placed the speed at 50 miles an hour; a Mr. Richard Bennett at 35 miles an hour; and Mr. Burzinsky "close to 40 miles an hour". Evidence was offered that the speed limit for trains passing through Oakland under the town ordinance was 20 miles an hour. However the court instructed the jury in appellant's tenth prayer that this ordinance

was not for the protection of the railroad employees on its right of way and that violation of that ordinance at the time of the accident was not evidence of negligence on the part of the appellant. Mr. Smith, the engineer of the train, testified that as they came to the crossing he was traveling approximately 20 miles an hour and that under the rules of the company he was allowed to drive that particular engine at that place 30 miles an hour. He said by shutting off the throttle the steam and smoke around the engine prevented everyone in the engine from seeing the track at all on this left curve. The only person he saw was the crossing watchman. He said the tonnage for the entire train was 3,650 tons and that his general order was to sound the whistle and to reduce the throttle and cut down on the steam and smoke as much as possible. The weather was clear that day. He said he blew one long, a short, and a long for the crossing. He said he "signed a signal for the Oak Street bridge". Mr. Allan T. Blount, a civil engineer employed by the appellant, said he made measurements of the appellant's track through the town of Oakland, starting at the station and going to a point at least 80 feet east of the Oak Street bridge. He said that on this particular engine the distance from the place where the fireman sits to the front of the cow catcher is 72½ feet. The fireman, sitting in his position on the cab of this engine, going east on the westbound track, could see an object 80 feet east of the Oak Street bridge not closer than 378.5 feet from that object. On this left curve the engineer could not see the track at all. He further said a man standing 80 feet east of the Oak Street bridge looking west in the middle of the westbound track could see a train approaching at a distance of 1,495 feet. From Mr. Blount's testimony it is evident that if the fireman had seen the deceased on the track at the earliest possible time, the train in order to avoid hitting the deceased would have been required to stop within 306 feet. Mr. W. F. Peck, employed as supervisor of air brakes for the appellant, testified that the total

weight of train No. 96 on October 20th, 1948, was 2,700 tons; that this train traveling at 20 miles an hour will run 450 feet after the air brakes are in emergency position "and that doesn't take into consideration the time to move it into that position or for the man to assume some emergency has arisen". He said if the train were traveling at 30 miles an hour it would have required 500 feet to stop it, and at 60 miles an hour 2,000 feet. The testimony of Messrs. Blount and Peck is not contradicted. As this train would have been required to stop 306 feet from the time the deceased could have been seen in order to avoid the accident, assuming that the train was traveling at even 20 miles an hour it could not have been stopped in time to avoid the accident.

In *Early v. New York Central R. R. Co.*, 333 Pa. 471, 5 A. 2d 110, the Court held that even if the train had been operated at an excessive speed this was not the proximate cause of the accident, the crucial test being whether proper warning of the approach of the train was given. See also *Kelly v. Director General of R. R.*, 274 Pa. 470, 118 A. 436; *Dixon v. Texas & P. Ry. Co.*, (Tex.), 164 S. W. 2d 252; *Conant v. Grand Trunk Ry. Co.*, 114 Me. 92, 95 Atl. 444. In *Hammer v. Minneapolis, St. P. & S. S. M. Ry. Co.*, 216 Wis. 7, 255 N. W. 124, 125 (1934), suit was entered to recover damages for the death of the deceased who was run over and killed by the railroad in the city of Superior. Wisconsin had a comparative negligence act. The speed of the train and failing to give proper warning at a street crossing were found to be the causes of the accident. The court found as a matter of law that the decedent was contributorily negligent. The jury found that 85 *percentum* of the total negligence was attributable to the defendant and 15 *percentum* to the decedent. In reversing and remanding the case for a new trial because there was no evidence to sustain the finding of the jury that the speed of the train had any causal relation to the accident, the court said: "There is evidence that the train was moving at a speed of from 25 to 30 miles per hour.

The failure to ring the bell could clearly be found to be a cause of the accident, but just as clearly the speed of the train had nothing to do with it. Had decedent been approaching the intersection of the tracks with the highway, and had his view of the train been affected by its speed, or had he been misled by this circumstance as to the prospects of crossing the tracks in safety, or had the severity of his injuries been increased by the momentum induced by the speed, a different situation would be presented. Here decedent was proceeding with his back to the train, and there is no evidence on which to base a conclusion that he would have received a more adequate warning, or that his conduct would have been different or his injuries less severe, had the train been proceeding at a proper speed. This is especially true in view of the fact that while the train was being operated at a greater speed than the permitted rate of 15 miles per hour, it was not driven at a high speed, as that term is usually understood in connection with motor-driven vehicles."

Finding that under all the evidence the speed of the train had no causal relation to Mr. Rodeheaver's death and that appellant's third and ninth prayers should have been granted, the judgment will be reversed and the case remanded for a new trial.

*Judgment reversed with costs, and case*
*remanded for a new trial.*