BALTIMORE & OHIO RAILROAD COMPANY *v.* WRIGHT ET AL.

(Consolidated Cases)

[No. 43, October Term, 1951.]

*Decided December 6, 1951.*

*Rehearing denied January 9, 1952.*

The cause was argued before MARBURY, C. J., and DELAPLAINE, COLLINS, HENDERSON and MARKELL, JJ.

*E. Stuart Bushong* and *Irvine H. Rutledge,* with whom were *William R. Offutt* and *Lane, Bushong & Byron* on the brief, for the appellant.

*John Wagaman* and *Clyde P. Bailey,* with whom were *Neil C. Fraley* and *Walter W. Dawson* on the brief, for the appellees.

COLLINS, J., delivered the opinion of the Court.

These are appeals from judgments rendered to Ruth Wright for personal injuries including the loss of her leg, sustained at a railroad crossing in Oakland, Maryland, and to Leslie Wright for his wife's medical expenses and for loss of her services, against the Baltimore and Ohio Railroad Company, (B. & O.), and Howard Tasker.

The cases were tried together before a jury and verdicts were rendered by the court upon answers to issues submitted, in the amount of $35,000 for Ruth Wright and $5,000 for Leslie M. Wright. Appellant, B. & O., filed motions for judgment N. O. V. and for a new trial. The motions were over-ruled, but a remittitur was entered in the sum of $10,000, reducing the Ruth Wright judgment to $25,000. From judgments on the verdicts and remittitur, the B. & O., alone, appeals.

At the time of this accident double tracks of the main line of the B. & O. railroad ran east and west through the town of Oakland and crossed Second Street, the main business street of that town which runs approximately north and south. The railroad crossing was at a grade and at an angle to Second Street, which is approximately 40 feet in width. The tracks crossing Second Street at an angle were 92 feet in length from one side of the street to the other. This crossing was protected by the usual cross-arms and by a watchman whose watchbox was on the east side of Second Street about 12 to 14 feet south of the tracks. There were no safety gates. The watchman usually stands, when trains are crossing Second Street, in the center of that street about 10 feet south of the tracks. During the day he carries a standard

with a stop sign, and at night he carries one red and one green lantern. In the watchbox is a small light which comes on when the train is five-eights of a mile east of the Second Street crossing, to warn the watchman of the approach of trains.

On October 23, 1948, shortly after 10 P. M., one of the appellees, Mrs. Ruth Wright, accompanied by her friend, Mrs. Edith Byers, was walking south on the east side of Second Street, intending to cross the railroad crossing to Leslie Wright's automobile which was parked on a lot south of the railroad crossing and on the west side of Second Street. Leslie Wright accompanied the two women part of the way, but when they stopped to talk with a friend, Mr. Wright kept on and crossed the railroad tracks to his parked automobile. As Mrs. Wright and Mrs. Byers neared the railroad crossing, they left the sidewalk on the east side of Second Street and walked over to the west side of Second Street and stopped in the street near the west curb, opposite the first parking meter, 35 feet north of the northernmost rail of the tracks. They did not step up on the sidewalk. They did not proceed further because they saw the headlight of an approaching westbound train. While they were waiting for the train to cross the street, an automobile driven by Howard Tasker, who was accompanied by Corlas Riley, going south on Second Street, drove very close to or across the first rail of the north track. Mrs. Wright and Mrs. Byers, standing about twenty feet to the rear of the Tasker automobile, thinking that the train was going to hit the Tasker car, started to run in a northerly direction. After Mrs. Wright had taken about one step, the cylinder on the right side of the engine struck the left front of the automobile, swung it around and its right front hit Mrs. Wright, who was then about 39 feet from the track, and injured her severely including the loss of her left leg. Such a blow would naturally not drive the automobile forward. The automobile came to rest after the accident still in the street facing north, which was the opposite direction

from which it approached the tracks. Mrs. Wright was lying in front of the automobile in the street with her head near the curb opposite the second parking meter from the tracks. Mrs. Byers was not injured.

An ordinance passed by the Mayor and Council of Oakland on August 7, 1939, limited the speed of trains through Oakland to 20 miles per hour. There was testimony in this case, that at the time of the accident, the train was moving at the rate of from 35 to 40 miles an hour. The court, in its charge to the jury, referred to this ordinance and allowed the jury to consider it. The appellant excepted to the court's instruction to the jury because the court did not instruct it that the 20 miles an hour ordinance was not published in public places as required by the statute and Charter and therefore never became operative. The Oakland Charter, Article 12, Section 425, Code of Public Local Laws of Maryland, 1930, (Flack's), provides in part as follows: "It shall be the duty of the town clerk to * * * enter all ordinances, passed by the Mayor and Council, and signed by the Mayor, in a book kept by him for that purpose, and the books of said corporation shall be open for inspection by any taxpayer at all times, and copies of all ordinances shall be put up in the public places of said town." The town clerk testified that the ordinance had been posted on the bulletin board of the City Hall and at no other place. It was recorded in the Minute Book. The appellant contends that this provision for publication of the ordinance was mandatory and unless this ordinance was published in accordance with that requirement, it was void. To support this contention the appellant cites a number of tax sales cases in which the notice required by statute was not given. Those cases and some others cited by the appellant are not in point here.

In *Atchison, Topeka & Santa Fe R. R. v. Baker*, 79 Kan. 183, 98 P. 804, 21 L. R. A., N. S., 427, cited by the appellant, a speed ordinance limiting the speed of trains to six miles an hour was found to have been erroneously admitted in evidence, because there was no

proof that the ordinance was ever published as required by the statute. However, in that case, the statute specifically required that the ordinance be published before it took effect. There is no such provision in the ordinance or the charter before us here. The case of *Santa Rosa City R. Co. v. Central St. R. Co.*, 1895, 4 Cal. Unrep. 950, 38 Pac. 986, cited by the appellant, was one where a statute required that the ordinance be published in some newspaper in Santa Rosa at least one time or posted in three public places in said city and should be enforced ten days after such publication or posting. There is no such requirement in the charter or ordinance now before us. In the case of *State, Ex Rel Bump v. Omaha & C. B. R. R. R. Co.*, 113 Iowa 30, 84 N. W. 983, 52 L. R. A 315, relied on by the appellant, there was a provision that the ordinance should not take effect until after it had been published. There is no such provision here.

What was said in the case of *Commonwealth v. Davis*, 140 Mass. 485, 4 N. E. 577, 578, seems appropriate here. In that case, a city ordinance provided that no person except by permission of the city government should deliver a sermon or lecture on the commons or other public grounds. A statute provided that all ordinances be recorded in the office of the clerk of the superior court for the county. It was claimed that the ordinance was invalid because it had not been so recorded. The Supreme Court of Massachusetts said in that case: "The defendant also contends that this ordinance is invalid because it has not been 'published two weeks consecutively in three daily newspapers published in the city' as required by the ordinances. There are two answers to this claim. The Revised Ordinances require such publication, but there is no provision that the ordinances shall not take effect until such publication. The provision requiring publication is directory. It contemplates a publication after the ordinance is enacted, and a compliance with it is not a condition to the validity of the ordinance." We are of opinion in this case that the

provision in the charter for posting the ordinance was directory and not mandatory and that this ruling of the trial court on this ordinance was correct. It was said in *Eastern Tar Products Corp. v. Tax Commission,* 176 Md. 290, at page 297, 4 A. 2d 462, at page 466: "The courts hold that where municipal ordinances have been enacted in pursuance of competent authority, they should be upheld by every reasonable intendment, and reasonable doubts as to the validity of an ordinance should be resolved in its favor." See also *Baltimore City v. Gorter,* 93 Md. 1, 26, 48 A. 445. In *Bond v. Baltimore,* 118 Md. 159, at page 167, 84 A. 258, at page 260, concerning the validity of an ordinance, the following was quoted: "And generally, when no rights will be impaired, provisions with no negative words or implications concerning the time and manner in which official persons shall perform designated acts, are directory." There was testimony here that there had been correspondence between the Council and the B. & O. about a former ordinance passed prior to 1939, which limited the speed of trains in Oakland to 30 miles per hour.

The appellant further contends the testimony of Mr. Leslie Wright, that at the time of the accident the speed of the train was "about thirty-five to forty miles per hour" was inadmissible in view of his lack of opportunity to observe. The testimony was admitted over appellant's objection and over a motion to strike it out. Mr. Wright testified that he went across the crossing ahead of his wife. As he crossed the track he saw the light in the watchbox indicating the westbound train was coming and when he got across the track he heard the train coming from the east. He walked over to his parked car, about one hundred and twenty-five feet south of the crossing, and saw the train when it came on the crossing. He had just opened his car door when he heard the crash and heard his wife scream. He was not looking at the train when it smashed into the Tasker car. He could not see the Tasker car because he was behind his own car. He waited until the train stopped

and then crawled through to get to his wife. He said he had been driving an automobile for twenty years and was familiar with the speed of vehicles and trains. He was 48 years of age and was employed as a trackman by the B. & O. Railroad Company and had been employed by that company for 26 years. When asked the question whether he had the opportunity to observe the speed of trains in his duties, he replied: "Yes, I've been along the track ever since I was born." Appellant claimed that this witness did not have sufficient opportunity for observation and his testimony of speed should be rejected. With this contention we do not agree. Wright was an experienced railroad man, had driven a car for twenty years, had been a trackman on the tracks of the B. & O. for 26 years. He saw the train as it started across the crossing and being only about 125 feet from the train, had sufficient opportunity to observe its speed. It was said in the case of *People's Drug Store v. Windham,* 178 Md. 172, at pages 181 and 182, 12 A. 2d 532, at page 537: "Accordingly it is well settled that any witness qualified by observation and experience, expert or non-expert, may testify to the speed of a moving automobile which he has observed. * * * Such an estimate is necessarily approximate and not exact, for without mechanical aid it is manifestly impossible for anyone, expert or non-expert, to estimate precisely the speed of a moving object, and that fact is assumed by everyone possessing ordinary common sense." This experienced trackman was certainly in a position to observe and to testify as to the speed of this train at the crossing.

The appellant asked the trial court to rule as a matter of law that the watchman, Hayden, was not negligent after the Tasker car fouled the track, and also assuming the watchman, Hayden, was not in his proper place with the red lantern when Tasker approached, his failure to be there was not the proximate cause of the accident, and assigns the court's failure to so rule as error. As the court was asked to rule on these questions as a matter of law, we will recite the evidence from which

the jury could have found against these requested rulings in a light most favorable to the appellees. Mr. Hayden, the watchman, admitted that he did not see Leslie Wright nor Mrs. Ruth Wright, nor Mrs. Byers anywhere near the crossing. Hayden also admitted that he had only been in the center of the street ten or fifteen seconds prior to the time the Tasker car drove on the tracks. Mr. Leslie Wright said that when he crossed the tracks ahead of the train, the watchman was standing at the curb about twenty-five to thirty feet above the watchbox and was not in his accustomed place. The watchbox was 12 or 14 feet south of the tracks. He was standing along the curb talking to somebody. Mrs. Ruth Wright testified when she saw the train coming the watchman was standing on the opposite side of the track, with his back to the crossing, along the curb up above the watchbox talking to a man. Mrs. Wright further said: "It was getting awful close, because the headlight was getting real bright, when I knew the trainman was still talking there, when I turned and started to run." Mrs. Byers said that when she saw the watchman, he was standing on the other side of the track from her. When asked the question: "At any time you saw him, did he leave that place where he was standing?" She answered: "No, I just glanced at him and saw him, that was all * * * Standing beside the watchbox." Corlas Riley testified he had not been drinking. He said that he was sitting on the right hand front seat of the Tasker car. Tasker was driving. Riley was familiar with that crossing and had crossed it many times. He said he was looking ahead and did not see a watchman on this south side of the crossing, that the watchman was not in his accustomed place and that, if he had been there, he would have seen him. Tasker testified that he had a bottle of beer and one "shot" of whiskey that evening. He said: "Well, I came up to the crossing and expected to see a watchman there and usually there is if there is any danger and the crossing is so rough you can't cross unless you go in second gear and when I ap-

proached I did not see any watchman and about the time I went up on the crossing I changed my car to second gear and was going on across the crossing and when I looked up there the train was coming out of the cut, so close I did not have time to do anything." He said there was nobody in the customary place where the watchman stands to warn traffic. He said he was looking up the street and did not see the watchman any place. Mr. Ilario Fazzalari, a witness produced by the appellant, during his testimony said: "I went on the other side, saw a man sitting on the running board of a car, I believe, Riley, Mr. Tasker was standing there. I said: 'What happened', this man, well, he said, 'The watchman was not there, 'I said: 'Yes, he was there, because I was away from him a few paces;' he said, 'are you the watchman?' I said: 'No.'" This evidence was before the jury for whatever weight they might give it.

In the case of *Gosnell v. B & O Railroad Co.*, 189 Md. 677, 57 A. 2d 322, safety gates were required and there were no safety gates. We there found that the railroad crossing sign was not adequate to warn travelers at night and that the railroad company had undertaken to warn the persons on the dual boulevard of the grade crossing by a watchman. There, in the absence of all other warning devices, the appellant and her husband testified absolutely that they were looking straight down the road and saw no watchman and received no warning. This corresponds with the testimony of Tasker and Riley, here. There, the watchman admitted that he did not see the car in which the appellant was riding until it was within fifty feet of the railroad crossing. There, we found, from the watchman's own testimony, that he did not give his warning until Gosnell was within fifty feet of the crossing. Here, the watchman admits he did not get in the center of the street until ten or fifteen seconds before the Tasker car drove on the track. The watchman in that case admitted that he was accused by someone at the crossing, other than the appellant and

her husband, of having no lights and no signals, which he denied. Here, there are several witnesses who say no warning was given. In that case, this Court found, 189 Md. at page 691, 57 A. 2d at page 328: "The appellee not having safety gates, in the absence of all other safety devices for crossing warnings at night, reasonable minds might differ as to whether the watchman gave the warning in sufficient time and in such a manner as to adequately warn the driver of appellant's car of the danger." There, we found that there was sufficient evidence that the lack of warning to the appellant was the proximate cause of the accident, to justify submission of the case to the jury. The jury here might have found that the failure of the watchman to give an adequate warning constituted negligence which continued right up to the instant of the collision, as contended by the appellees. *Pennsylvania Railroad Company v. State,* 188 Md. 646, 653, 654, 53 A. 2d 562. We are of opinion that these instructions were properly refused.

The appellant also contends that the negative testimony of the appellees' witnesses as to the position of the watchman as Tasker drove on the tracks does not prevail and is rendered incredible against the positive testimony of appellant's witnesses. Appellant apparently relies on the following quotation from *State v. B. & O. R. R. Co.,* 171 Md. 584, at page 593, 190 A. 231, at page 235: "* * * such testimony of inattentive or patently preoccupied witnesses will not prevail against the affirmative testimony of the actors who rang the bell and blew the whistle, and of the other and disinterested witnesses who, either as actors or observers, rang the bell or heard the bells ringing, and blew the whistle or heard it blowing." It was further said in that case, 171 Md. at page 594, 190 A. at page 235: "If there had been, with this negative testimony, affirmative testimony that the signals had not been given, the question of whether the signals were given would have been an issue of fact for the jury, provided the positive statement is credible." In this case we have affirmative testimony

from credible witnesses that the watchman was not in his accustomed place in the middle of the street. Some of these witnesses testified just where the watchman was at the time. The weight of this testimony was a question for the jury.

This appellant finally contends that the court in this case should have instructed the jury, as prayed by it, that the speed of the train under the evidence in this case was not the proximate cause of the accident. As the granting of this instruction would have been a ruling on the evidence as a matter of law in favor of the appellant, we will recite the evidence as to the speed of the train in a light most favorable to the appellees. Ivan F. Stephens, road foreman of engines for the appellant, testified that the best stopping distance of a 62 car loaded freight train, similar to the one here, at 25 miles per hour over a level track would be 779 feet and at 20 miles per hour 610 feet. Mr. Allen T. Blunt testified for the appellant that an object in the center of the Second Street crossing is visible at a distance of 312 feet to the east, on a clear night. So even if the train were traveling at 20 miles per hour, the collison with the Tasker automobile could not have been avoided. Therefore, had Tasker been the plaintiff, the speed of the train could not have been a proximate cause of the damage to his automobile. See *B. & O. R. R. Company v. Rodeheaver*, 197 Md. 632, 81 Atl. 2d 63, where a watchman was killed by a B. & O. train, three days previous to the accident in the instant case, about 200 feet east of the point of collision here. Trooper Henline and Leslie Wright testified that they thought the engine stopped at the Southern States Building. Henline estimated the distance of that building from the crossing at approximately 1,050 feet, Leslie Wright at 1,000 to 1,200 feet, and John Wilson, B. & O. employee, at 1,500 feet. Engineer Zinn testified that he applied the emergency brakes when 250 feet east of the crossing. The jury could therefore have found that the train traveled 250 feet plus 1500 feet plus 92 feet, the width of the

crossing, or a total of 1,842 feet after the emergency brakes were applied. The jury could therefore have well believed that the speed of the train was at least 40 miles per hour on the crossing as testified to by Leslie Wright. This was twice the lawful speed.

In *McIntosh v. Pennsylvania R. Co.*, 1941, 111 Ind. App. 550, 38 N. E. 2d 263, the plaintiff was a traveler on the public streets of Gary, Indiana, about eight feet north of the railroad crossing. The train, traveling at the rate of 70 miles per hour, in violation of an ordinance limiting its speed to 15 miles per hour, struck an automobile on the crossing with such force and violence that certain of its heavy parts were thrown through the air, striking and injuring the plaintiff. The Indiana Appellate Court said in that case at page 267, quoting from *Miller, Adm'r., v. Union Pacific R. Co.*, 290 U. S. 227, 54 S. Ct. 172, 78 L. Ed. 285: " '* * * the vice of the argument consists in the attempt to separate into two distinct causes (remote and proximate) what in reality is but one continuous cause; that is to say, an attempt to split two inseparable negligent acts which, uniting to produce the result, constituted mutually contributing acts of negligence on the part of the railroad company and the driver of the automobile. The negligence sought to be established against the railroad company was not only the failure to sound the whistle, but operation of the train at a rate of speed dangerous and unusual, and which necessarily would bring the train into the city at a speed far beyond the limit prescribed by the city ordinance. Assuming, upon these facts, that a finding by the jury that the train was negligently operated would be justified, such negligence continued without interruption down to the moment of the accident. The same is equally true in respect of the contributory negligence of the driver of the automobile. The result, therefore, is that the contributory negligence of the driver did not interrupt the sequence of events set in motion by the negligence of the railroad company or insulate them from the accident, but concurred there-

with so as to constitute in point of time and in effect what was essentially one transaction.' It should also be pointed out that in the instant case the jury, if the matter had been submitted to it, might have concluded that the negligent act of the appellee continued up to and acted concurrently with the act of the driver of the automobile in causing the appellant's injury, and that the act of said automobile driver did not intervene and supersede and break the line of causation of the negligent act of the appellee, and further that injury to pedestrains, such as the appellant was, was reasonably foreseeable." See also *Marchand v. Gulf, C. & S. F. Ry. Co.* 20 Tex. Civ. App. 1, 48 S. W. 779; *Gulf C. & S. F. Ry. Co. v. Marchand,* 24 Tex. Civ. App. 47, 57 S. W. 860. Compare *Evansville & T. H. R. Co. v. Welch,* 25 Ind. App. 308, 58 N. E. 88.

In *Mellon v. Lehigh Valley R. Co.,* 282 Pa. 39, 127 A. 444, 445, a train traveling at an "excessive speed", 30 to 40 miles an hour, struck a taxicab on the tracks at a crossing. The taxicab was thrown against a signal post ten feet from the track, which fell and injured plaintiff who was waiting to cross the tracks. In a suit against the railroad plaintiff obtained a judgment, and defendant urged on appeal that its motion for judgment N. O. V. should have been granted because "the accident resulted from the sole negligence of the cab driver in going upon the track in the path of the approaching train, apparently in an effort to beat it across." The cab driver claimed that when he got to a point where he could see in the direction of the train, it was too late to stop, and he made "an unsuccessful effort to get across ahead of the train". In affirming the judgment the court said: "Of course, if the negligence of the cab driver was the sole efficient cause of the accident, defendant, although negligent, would not be liable, but had the train moved at a moderate speed the cab might have crossed in safety, or, had timely warning been given, the cab driver might have known of the train's approach before he came to the crossing. It cannot,

therefore, be affirmed that defendant's negligence was not a concurring cause of the accident. * * * The verdict of the jury, under the instruction of the trial judge, was in effect a finding that the negligence of the cab driver was not the sole cause of the accident. There was no break in the chain of events from the time the train hit the cab until the post hit the plaintiff; so it cannot be found as a legal conclusion that striking the cab was not the proximate cause of her injury."

In *Sonnenburg v. Monumental Motor Tours, Inc.*, 198 Md. 227, 81 A. 2d 617, a defendant's bus was struck by another defendant's car and thrown against plaintiff's building. Plaintiff contended there were two accidents, (1) collision of the bus and the car and (2) collision of the bus and the building, and that negligent speed of the bus was a contributing cause of the second accident. We rejected this contention on the double ground that there was no evidence of excessive speed of the bus or of causal relation between the speed of the bus and damage to the plaintiff's property. It was said there at pages 621 and 622: "Appellant stresses the 'terrific rate of speed' of the bus. There is no evidence either (1) that the speed of the bus was excessive or (2) that it had any causal relation to the damage to appellant's property. If we assume, without deciding, that testimony that the bus was running 'at a terrific rate of speed' was admissible in evidence, *People's Drug Stores v. Windham*, 178 Md. 172, 180, 12 A. 2d 532, it was not legally sufficient to show that the speed was excessive and unlawful. *Cf. Kaufman by Deutch v. Baltimore Transit Co.*, 197 Md. 141, 147, 78 A. 2d 464, 467. The only speed that caused damage was speed of the Cromwell car. When a bus moving south is struck by a car moving west the bus will naturally be thrown both west and south of the place of collision. If the bus is struck at all, it will be thrown from its course. If it is moving at all, it will continue in its course as changed by the blow. Only if the bus is standing still will it be thrown in the same direction as the course of the car." The

language quoted marks the distinction between that case and the instant case. We held that if the bus was in motion at all the natural consequence of being struck by the car was to throw the bus in the direction of the plaintiff's property.

In the much cited case of *Sun Cab Co. v. Faulkner,* 163 Md. 477, 163 A. 194, and strongly relied on by the appellant here, plaintiff was a passenger in defendant's Sun cab and while defendant's cab was going through a green light, it was struck by a Yellow cab going through the red light. Plaintiff contended that defendant, Sun cab, was negligent in excessive speed of its cab. This court through Chief Judge Bond disposed of the obvious fact that most collisions would not occur if one or the other vehicle had been going at a higher or lower rate of speed. He pointed out that this "circumstance" is a coincidence which has no causal relation to speed or negligence. It was there said, 163 Md. at pages 479 and 480, 163 A. at page 194: "If negligence is found in the rate of speed at which the Sun cab was being driven, that fact alone does not, of course, answer the question of liability. The negligence must have been the cause of the collision. *Taxicab Co. v. Hamburger,* 146 Md. 122, 125 A. 914; *United Rwys. & Elec. Co. v. Perkins,* 152 Md. 105, 110, 136 A. 50; *Slaysman v. Gerst,* 159 Md. 292, 299, 150 A. 728; *Philadelphia, W. & B. R. Co. v. Stebbing,* 62 Md. 504, 516. There would be no foundation in fact here for a holding that by driving at a reduced speed the Sun Company driver might have avoided the collision after the two cabs came within sight of each other. The contribution of the Sun cab to the accident appears to have been only that of being there at the moment, a circumstance which might have arisen with or without negligence in approaching the place. But taking it as proved that there was negligence in the rate of speed in this instance, that negligence, in the approach, must be found to have been the cause of the collision, or there can be no legal responsibility for it on the Sun Company's part. The principal cause was,

obviously, the unexpected coming through of the Yellow cab, in violation of the right of way. Its doing so was not a consequence of any speed maintained by the Sun cab. Whatever other consequences the speed might have threatened, it could not be said that it threatened to cause a collision with a cab so coming through. On the contrary, the situation created by it, if left to itself, with all its natural consequences, would have been a safe one; and it was only by the intervention of the independent agency that the collision resulted, an independent agency not set in motion or at all influenced by the driving of the Sun cab. That being true, the assumed negligence of the driver of that cab could not be treated as a proximate, legal cause of the accident and injury." It will be noted that the question was whether the speed of the Sun cab caused the collision, not whether it aggravated the consequences of the collision.

In *Koester Bakery Co. v. Poller, etc.*, 187 Md. 324, 50 A. 2d 234, heavily relied on by the appellant, we held that the evidence would not support a finding of aggravation of the plaintiff's injury by the speed with which one defendant's street car collided with the other defendant's truck. Plaintiff was a street car passenger and his injuries were held to have been caused solely by negligence in the operation of the truck and not by negligence on the part of the railway company. It was there said, 187 Md. at page 332, 50 A. 2d at page 238: "The appellant contends, however, that the excessive speed accentuated and aggravated the injuries to the plaintiff, in that the impact would have been slighter had the speed been less. But we think the evidence in this case would not support a finding of aggravation. Whether a lesser injury would have resulted from an emergency stop at 30 miles per hour, than from an emergency stop at 40 miles per hour, is a matter of pure speculation, even if it be assumed that the car could have been stopped in a shorter distance at the slower speed." This language distinguishes that case

from the instant case. It would have been "pure specula-
tion" to find that plaintiff would have been injured less
if the car had been going 30 instead of 40 miles an hour.
On the other hand, in *Charlton Bros. Company v. Gar-
rettson,* 188 Md. 85, 51 A. 2d 642, we held that the rail-
way company was negligent in its high rate of speed
and that there was evidence of causal relation between
this negligence and the extent of the passenger's injury
from collision between the car and a truck, and that
both defendants were negligent.

In *Pennsylvania Railroad Co. v. State,* 188 Md. 646, 656,
657, 53 A. 2d 562, we held that there was evidence of
negligence in failing to guard the crossing properly, but
not in the speed of the oncoming train. On the question
of speed, we held that there was no negligence. Ap-
parently it was not suggested that the victims would
not have been killed by the collision if the speed of the
train had been less at the time of the collision.

The line between evidence of negligence and causal
connection and mere speculation depends upon the facts
of each case. In the instant case the evidence appears
more than speculation. Plaintiff was injured when de-
fendant's train hurled the other defendant's automobile
completely around into the plaintiff. The force of the
collision between the train and the car, and therefore
the speed of the train, was a direct and necessary factor
in the plaintiff's injury. There is some evidence that
the train was going at about twice the lawful rate of
speed, judging not only from the estimates, but from
the distance at which the train is said to have been
stopped. *McIntosh v. Pennsylvania Railroad Co.,* 111
Ind. App. 550, 38 N. E. 2d 263, *supra,* is sound and direct-
ly supports the plaintiff in the instant case. The court
distinctly held there that the jury might find that the
railway company should expect that collision with an
automobile, carelessly driven, would be injurious not
only to occupants of the automobile but also to bystanders.
In that case the speed was four times the lawful speed,
but the court did not attempt to relate speed and dis-

tances closely. In the instant case the evidence of both speed and consequences is substantial and sufficient to go to the jury. *Miller v. Union Pacific Railroad Co.*, 290 U. S. 227, 54 S. Ct. 172, 78 L. Ed. 285, quoted in *McIntosh v. Penn. R. R. Co.*, *supra*, also supports the plaintiff. *Wood v. Pennsylvania R. R. Co.*, 177 Pa. 306, 35 A. 699, 35 L. R. A. 199, relied on by the B. & O., is a well reasoned case, and substantially similar to *Palsgraf v. Long Island R. R. Co.*, 248 N. Y. 339, 162 N. E. 99, 59 A. L. R. 1253, cited and quoted in *State, Use of Arnoff v. Baltimore Transit Co.*, 197 Md. 528, 531, 80 A. 2d 13, 15-16. In the *Wood* case it was held that the railroad company could not reasonably expect that the plaintiff, a passenger standing on its station platform, would be injured by being struck by the corpse of a negligent pedestrian struck at a nearby street crossing by the defendant's passing train. In the *Palsgraf* case it was held that the railroad company could not expect that negligence, if any, in pushing a passenger to prevent him from falling from a train would cause injury to the plaintiff by the falling and explosion of a package of fireworks held under the passenger's arm.

The appellees' case is suported on principle and on authority. Inasmuch as Mrs. Wright's injury was due not only to collision between the train and the automobile, but also to the great force of the collision, the jury was entitled to find that excessive speed was a proximate contributing cause of plaintiff's injury. The appellee was not injured by the mere hitting of the automobile but by the train moving it with great force more than 35 feet.

*Judgments affirmed, with costs.*

MARBURY, C. J., delivered the following dissenting opinion, in which HENDERSON, J., concurred.

One of the important questions in this case is whether the speed of appellant's train was a proximate cause of the accident. The testimony most favorable to the ap-

pellees as to the speed is that of the witness Wright, who said it was going from 35 to 40 miles per hour. The town ordinance limited the speed to 20 miles per hour. When the engineer rounded the curve which was the first point at which he could see the Tasker car on the track, he was 312 feet away. At 20 miles an hour, the testimony showed that the average stopping distance would be 610 feet, so that had the train been going at the rate of speed allowed by the ordinance, it could not have stopped in time to avoid hitting the car.

On this point, the trial court instructed the jury that the mere violation of an ordinance regarding speed was not in itself negligence, but it might be considered in the determining whether such negligent operation at a greater speed than was reasonable under the circumstances was the proximate cause of the injury. The court then said: "In referring to proximate cause I mean this—if you decide that the speed was excessive under the circumstances but that the accident would have occurred, and that Mrs. Wright would have been injured, even if the train had been operating at a reasonable speed, then you may find that excessive speed was not the proximate cause of the injury to Mrs. Wright but that she was injured solely because of the position of the Tasker automobile in a place of danger." Appellant specially excepted to the court's instruction because it failed to instruct the jury that speed, under the evidence in this case, was not the proximate cause of the accident. It seems to me that the appellant was right in this respect and that the jury should have been so instructed.

In the case of *Pennsylvania Railroad Co. v. State*, 188 Md. 646, 53 A. 2d 562, there were two questions of negligence, one involving the conduct of a switching operation where no flagman was left at the crossing when it was temporarily cleared by the switching train, and the other the speed of a northbound train on the adjacent track, which struck the truck in which the plaintiff's decedent was riding. As in the instant case, the driver

of the truck was negligent in proceeding across the track. The railroad company in that case asked the court to instruct the jury that there was no legally sufficient evidence from which the jury might find negligence in the operation of the train which struck the truck. We said that while there was legally sufficient evidence of negligence in the failure to provide additional warning at the crossing, we found no legally sufficient evidence of negligence in the operation of the northbound train, and the defendant was entitled to have this issue withdrawn from the consideration of the jury. The contention was that the speed of the northbound train was excessive. We said that speed in itself was not negligence *per se,* and that at the time the truck entered the tracks, the northbound train was too close to be stopped short of the crossing.

In the case of *Baltimore & Ohio R. Co. v. Rodeheaver,* 197 Md. 632, 81 Atl. 2d 63, we held that the speed of the train had no causal relation to Mr. Rodeheaver's death, and reversed the judgment against the railroad, because the trial court did not so instruct the jury. There the same contention as here was made by the railroad, namely that had the train been traveling at the legal speed of 20 miles per hour, it could not have been stopped in time to avoid the accident. We agreed with that point of view, and the majority opinion in the instant case cites the *Rodeheaver* case as authority for the statement that "had Tasker been the plaintiff, the speed of the train could not have been a proximate cause of the damage to his automobile."

The damage to Mrs. Wright was caused by the impact between the train and the automobile, which caused the automobile to strike her. If the speed of the train was not a proximate cause of the impact between it and the automobile, then the only way by which it could have become a proximate cause of the impact between the automobile and Mrs. Wright was that the force engendered by the speed caused the automobile to strike her. That is the theory on which the case was submitted

to the jury, and the theory adopted by the majority opinion.

It is suggested in support of that theory that had the train been proceeding at a speed not exceeding 20 miles per hour, the Tasker car would not have been driven into the appellee and she would have escaped injury. It is just as possible to think that had the train been going 60 or 70 miles an hour, it would have driven the automobile forward instead of turning it, so that it would not have struck the appellee. All of this is pure speculation and conjecture. No one can tell what would happen to an automobile hit by a train going 20 miles an hour, and the jury should not be permitted to guess or give its own version of what it might think would have happened under such circumstances. The evidence does not disclose any basis for a holding that the legal speed on the part of the train would have avoided the accident to Mrs. Wright, and, therefore, it does not give the court any basis for submitting to the jury the decision whether the speed of the train was the proximate cause of the accident. The whole idea is merely a theory and an assumption which has no foundation in any testimony, or in any proper inference from any testimony. Such a question should not have been submitted to the jury under the evidence in this case. The judgments should be reversed and the cases remanded for a new trial on this ground.

Judge Henderson authorizes me to say that he agrees with the views herein expressed.